EAST BOOTHBAY WATER DISTRICT
*vs.*
INHABITANTS OF TOWN OF BOOTHBAY HARBOR

Lincoln.   Opinion, February 5, 1962.

*Richard B. Sanborn,* for plaintiff.

*James L. Reid,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

SULLIVAN, J.   Plaintiff and defendant have reported this case upon complaint, answer and agreed statement of facts and seek a declaratory judgment. R. S. (1954), c. 107, §§

38, through 50; c. 103, § 15, P. L., 1959, c. 317, § 69, c. 378, § 67; Maine Rules of Civil Procedure, Rule 72 (b), 155 Me. 573.

Defendant is a town and a municipal corporation. R. S., c. 90-A, § 2. By special enactment of the Legislature and in a proprietary as distinguished from a governmental function (*Woodward* v. *Water District*, 116 Me. 86, 90) it has owned a public, water utility system (R. S., c. 44, § 16, IV, XII, XVI, as amended) and for scores of years has supplied water service to consumers in the Towns of Boothbay and Boothbay Harbor and to customers at Squirrel Island in the Town of Southport.

Plaintiff is a quasi municipal corporation and water district created by the Legislature (P. & S. L., 1959, c. 132) with authority to provide water for users in the southeast portion of Boothbay, in the village of East Boothbay and in a portion of Boothbay Harbor. Its assigned territory is a component of the area served for the same purposes by the defendant.

The agreed statement of facts filed by the parties together with their requests for rulings is as follows:

"It is hereby stipulated and agreed between the parties hereto as follows:

"1. The parties accept as fact for the purposes of this case the material facts found by the Court in the case of *Inhabitants of Boothbay vs. Inhabitants of Boothbay Harbor, 148 Maine 31.*

"2. Boothbay and Boothbay Harbor are two adjoining and separate municipal corporations.

"3. Boothbay Harbor owns and operates a water system which furnishes water for the area to the town of Boothbay Harbor and serves a portion of the town of Boothbay, all in accordance with the following chapters:

*P & S Laws 1889, Chapter 381.*
*P & S Laws 1891, Chapter 241.*
*P & S Laws 1895, Chapter 56.*
*P & S Laws 1903, Chapter 203.*
*P & S Laws 1923, Chapter 7.*
*P & S Laws 1937, Chapter 52.*

"4.   The assets of the Boothbay Harbor Water System within the geographical limits of the East Boothbay Water District, which operates under P & S Laws of 1959, Chapter 132, primarily consist of surface mains and pipes and appurtenances for summer service and include one standpipe therefor, including the land on which the standpipe is located, also approximately 600 feet of underground main which cannot be used for winter service because of its shallow depth.   The above lines are about one-half on public roads and one-half on private property.

The lines located on private property are not located on easements but are there by permission and consent of the owner except in the case of five houselots in which there are recorded easements.

"5.   The District is presently constructing its water system, which is now half finished and is anticipated to be finished about December, 1961, and this system will furnish water on a year-round basis with underground mains.

"6.   The great bulk of the assets of the Boothbay Harbor Water System in the area of the District is of no economic use to the District because of the fact that they are seasonal surface lines which are being replaced by year-round underground mains. However, a portion of the surface pipes of the Town in some of the summer cottage areas could be of use to the District if they could be purchased or condemned at a fair value.

"7.   The entire plant and facilities operated by the Boothbay Harbor Water System are wholly-owned by the town of Boothbay Harbor.   The water system has derived its revenues from cus-

tomers both in Boothbay Harbor, Boothbay, and other localities in the area that it serves.

"8. In order for the parties to further negotiate under Section 9 of the District's charter or to take steps with reference to eminent domain under Section 10, it is necessary that the following legal issues be decided:

1. Prior to the effective date of the District's charter did the town of Boothbay Harbor have an exclusive franchise for furnishing public water service within the area of what is now the District?

2. Following the effective date of the District charter, does the District now have an exclusive franchise within said area?

3. Is the District required to purchase or to take any of the water facilities of the town of Boothbay Harbor located in the area of the District?

4. If the District takes any of the facilities of said town of Boothbay Harbor located in the area of said District will it be required to pay simply the value of the facilities so taken or will it be required in addition to pay severance damages or consequential damages to other property of the town of Boothbay Harbor located within the area of said District?

5. If it takes any of such facilities within the area of the District may it pay only the value of the facilities so taken or must it also pay severance damages or consequential damages for other assets of the town of Boothbay Harbor located outside of the area of said District?

6. Whether or not the District takes any of the property of the town of Boothbay Harbor within the area of the district, must it compensate the town of Boothbay Harbor for the loss of the Town's investment and business as re-

sult of the town losing those customers within the area of the District?

7. May the Town, if the District does not take its property within the area of said district, remove its property from the area of said District?"

An examination of the creative private and special laws which have imparted life and have conferred authority upon the plaintiff and the defendant corporations demonstrates convincingly that neither plaintiff nor defendant has been endowed with an exclusive franchise to furnish public water service within its respective territory. There is to be found in the legislative history of both parties no affirmative grant of monopoly and this court in a case very similar in its circumstances to the instant case has eschewed mere implication.

"What construction, then, is to be given to the plaintiffs' charter? Does it in terms or by necessary implication confer those exclusive rights asserted by the plaintiffs? While it is the accepted doctrine that all grants are to be construed according to the intention of the parties, yet there are certain general rules of construction by the light of which such contracts are to be examined. These rules are well settled by numerous authorities. One is, that in all grants by the government to individuals or corporations, of rights, privileges and franchises, the words are to be taken most strongly against the grantee, contrary to the rule applicable to a grant from one individual to another. Another rule is, that one who claims a franchise or exclusive right or privilege in derogation of the common rights of the public, must prove his title thereto by a grant clearly and definitely expressed, and cannot enlarge it by equivocal or doubtful provisions, or probable inferences. 'Every reasonable doubt is to be resolved adversely. Nothing is to be taken as conceded but what is given in unmistakable terms, or by an implication equally clear. The

affirmative must be shown. Silence is negation, and doubt is fatal to the claim. This doctrine is vital to the public welfare.' Fertilizing Co. v. Hyde Park, 97 U. S. 666. 'Repeated decisions of this court,' remarks Mr. Justice Clifford, in Holyoke v. Lyman, 15 Wall. 512, 'have established the rule, that whenever privileges are granted to a corporation, and the grant comes under revision in the courts, such privileges are to be strictly construed against the corporation and in favor of the public, and that nothing passes but what is granted in clear and explicit terms. Whatever is not unequivocally granted in such acts is taken to have been withheld, as all acts of incorporation and acts extending the privileges of corporate bodies are to be taken most strongly against the corporation' - - - -

"There was no surrender on the part of the state of the right to grant other franchises of a similar character, if the interests or necessities of the public required it; - - - -

"The plaintiff's charter was was granted after the enactment of the general statute of 1831, c. 503, (R. S. c. 46, § 23,) reserving to the legislature the power to amend, alter or repeal at pleasure all acts of incorporation afterwards passed, as if they contained express provision to that effect, unless there should have been inserted therein an express limitation to the contrary. - - - -"
*Rockland Water Co. v. Camden and Rockland Water Co.*, 80 Me. 544, 563, 568, 569.

Note:   General statute of 1831, c. 503 is now R. S., 1954 c. 53, § 2.

" - - - - The legislature may at any time, according to its own wisdom, grant to the municipalities within which this water system is situated franchises similar to the ones in question. It may grant similar franchises to one or more corporations like the Waterville Water Company or the Maine Water Company. (authorities cited)   It has granted similar franchises to this plaintiff, a

municipal district, and has even authorized it to take away from the defendant water company all the franchises it holds within the district and Benton and Winslow. - - - - But the defendants say that the Maine Water Company was 'practically in the enjoyment of an exclusive franchise' because it had no competitor, although its franchise may not be legally an exclusive one, - - - And we say that the fact that the company was doing its business without competition may and should be considered by the appraisers when they are valuing the property of the defendant as a going concern. That fact is one of the characteristics of the going business, and may enhance its value. We are considering now only the legal situation of the company. There is a difference between a franchise which is practically exclusive and one which is actually exclusive, as there is a difference between uncertainty and certainty. The distinction is vital in principle, and it may be important in fixing value - - -

"Again, the charters under which the company operates are subject to repeal by the Legislature. R. S. c. 46, § 23 (now R. S. 1954, c. 53 § 2) The franchises are not perpetual and irrevocable. It may be that it is extremely unlikely that the Legislature would repeal the charters, without providing for compensation in some way. The probabilities are fairly open to consideration. But the legal condition exists. It is a factor to be considered for what it is worth."

*Kennebec Water Dist.* v. *Waterville*, 97 Me. 185, 206.

The plaintiff is "authorized to acquire by purchase *all or part* of the entire plant, properties, franchises, rights and privileges owned by Town of Boothbay Harbor Water System (defendant) located within the area served by the East Boothbay Water District (plaintiff) - - - - and said company (defendant) is hereby authorized to sell - - - - to said dis-

trict" (plaintiff) P. & S. L., 1959, c. 132, § 3. (Italics supplied.)

"In case the said trustees (plaintiff) fail to agree with the Town of Boothbay Harbor Water System (defendant) upon terms of purchase, then said water district (plaintiff) - - - - is hereby authorized *to take said properties, interest and franchises* of said Town of Boothbay Harbor Water System (defendant) *as set forth in section 9.*" P. & S. L., 1959, c. 132, § 10. (Italics supplied.)

The plaintiff is authorized to have appraisers fix the valuation *"of the plant, property and franchises"* of the defendant. *id.* (Italics supplied.)

The appraisers shall fix the valuation of *"said plants, properties and franchises." id.* (Italics supplied.)

On payment, etc., by the plaintiff the *"said plant, properties and franchises* of" defendant become the property of plaintiff. *id.* (Italics supplied.)

Thus Section 9 of the Act of 1959 *authorized* a purchase by plaintiff of *all or part* of defendant's assets located in plaintiff's terrain of service. For want of a meeting of the minds of buyer and seller the Legislature *authorized* but did not prescribe a process of condemnation. Condemnation, if any there should be, was to be effected by the sole origination of the plaintiff. The properties to be appropriated by the plaintiff were described in section 10 referentially "as set forth in section 9." The language of section 10 as painstakingly corelated with that of section 9 preponderates very appreciably to the conclusion that in section 10 the Legislature purposed to designate "the entire plant, properties, rights," etc. of the defendant rather than to denote "all or part of the entire plant," etc. Such is the abiding and persistent impression engendered. And were that objective reality not so, the contrary would be

regrettable and grievous. An election accorded to the plaintiff to condemn selectively a portion of the defendant's franchises or assets in plaintiff's domain and to prescind at will from the remainder of such properties could be obviously productive of resultants very partial to the plaintiff and sacrificial or even crippling for the defendant whose license to function in plaintiff's territory has not been repealed.

Save for what we are to glean from the text of the Act of 1959 the record in this case affords no information of the factors and rationale which decided the Legislature to enfranchise the plaintiff's operation in part of the region of the defendant's water system. The court accredits the legislative motives as sufficient and justified. The lawmakers tendered to both District and Town fair leave and scope for a bargain and sale of defendant's localized properties to plaintiff and for an equitable and satisfying meeting of the minds. Beyond that the Legislature perhaps had resolved that rivalry in service or substitution of service was desirable and should be made possible. It is true that the Legislature by conferring upon the plaintiff the privilege of condemning or of foregoing condemnation of all of the defendant's assets so localized was in all practical effect commissioning the plaintiff sole arbiter as to whether defendant should or should not prolong its public water service in plaintiff's zone. The Legislature becomingly and constitutionally assured and secured to defendant fair and equitable worth in the event of a condemnation. The Legislature until such condemnation has not foreclosed defendant's operation in plaintiff's area. Quite possibly the Legislature in the absence of condemnation was conserving to the defendant the resource of supplanting the plaintiff by a regenerated or superior service for the public good or of inducing and accelerating condemnation by efficient service.

With the approbation of and in conformity with the conditions imposed by the Public Utilities Commission defend-

ant would be free to withdraw from the area assigned to the plaintiff. R. S., c. 44, § 48.

The Public Utilities Commission under stated circumstances may order a public utility for a fixed compensation to share with another public utility the use of the former's conduits laid upon or under public ways. R. S., c. 44, § 54.

If the plaintiff does not resort to condemnation, then the defendant here will have suffered no actionable damage.

If the plaintiff elects to condemn it must appropriate and pay the fair and equitable worth of all the franchises and assets of defendant in plaintiff's territory with the single exception of defendant's corporate franchise.

*Kennebec Water District* v. *Waterville,* 97 Me. 185, 199, 209, P. & S. L., 1959, c. 132, §§ 9, 10.

Construction of the legislative acts enumerated in the agreed statement of these parties litigant is a matter of law. Actual damages and the value of franchises and assets are a judicial question. Little or no evidence upon this latter issue is before us.

As for the incidence of severance damages this court for present purposes has adequately stated the norm:

" - - - - That rule applies only when the property taken and the property left may fairly be considered one property, and not when they are separate and distinct - - - -"

*Kennebec Water District* v. *Waterville, supra,* 212.

The property to be considered under existing circumstances must be regarded and appraised as having the characteristics of a going business in operation in plaintiff's territory with all proper considerations such as, without limitation thereto, the properties and franchises in themselves and as a source of income, rates, net income and profit present and prospective.

*Kennebec Water District* v. *Waterville, supra,* 206
through 220.

Good-will, however, this court has viewed with disfavor
and somewhat peremptory logic:

> " - - - - But the term 'good-will' may be misleading.
> Lord Eldon said that good-will is nothing more
> than the probability that the old customers will
> resort to the old place. Crutwell v. Lye, 17 Ves.
> Jr. 335. See Flagg Mfg. Co. v. Holway, 178 Mass.
> 83. Under any possible definition it involves an
> element of personal choice. This phrase is inap-
> propriate where there can be no choice. So far as
> the defendants' system is 'practically exclusive,'
> the element of 'good-will' should not be considered.
> Bristol v. Water Works, supra, (19 R. I. 413)."

*Kennebec Water District* v. *Waterville, supra,* 216.

> *Case remanded to the Superior Court*
> *for entry of a declaratory judgment*
> *in accordance with this opinion.*