### The AMALGAMATED SUGAR COMPANY, LLC Corporation and LN Partnership,

v.

### NL INDUSTRIES, INC., Robert A. Bicks, Nicholas F. Brady, Maurice F. Granville, William A. Marquard, James F. Mathis, Theodore C. Rogers, Jan M. Ross, Herman C. Schmidt, Robert G. Schwartz, Donald V. Seibert, Eleanor B. Sheldon and Thomas P. Stafford, Defendants.

### No. 86 Civ. 5010 (VLB).

United States District Court, S.D. New York.

Aug. 5, 1986.

Townley & Updike, Kirkland & Ellis, for plaintiffs; James K. Leader, Thomas A. Gottschalk, Philip S. Beck, of counsel.

Wachtell Lipton Rosen & Katz, for defendants; Paul Vizcarrondo, Jr., Robert B. Mazur, Paul Rowe, of counsel.

### Oral Decision

VINCENT L. BRODERICK, District Judge.

I shall be dealing with the plaintiffs' motion for a preliminary injunction and the defendants' motion to stay or dismiss. What I have to say will constitute my findings of fact and conclusions of law for the purposes of the motion for a preliminary injunction.

I find on what is before me that I do have jurisdiction over this action under 28 U.S.C. § 1332 (a)(1), since more than $10,-000 is involved and the plaintiffs and defendants are from different states. I also find that I have jurisdiction under 15 U.S.C. section 78aa and 28 U.S.C. § 1331. I have pendent jurisdiction with respect to the state claims and the preliminary injunction pertains to a state claim.

With respect to the defendants' motion for a stay or dismissal on the grounds that the matter involved in this is to such a large extent concerned with New Jersey State law, I shall deal with that later. I will note at this point that the defendants did agree that no distribution of rights certificates would be made until that stay motion was decided.

I will take up now plaintiffs' motion for a preliminary injunction. This motion as originally made was predicated upon two grounds. First that the directors of the defendant corporation did not have the power under New Jersey law to adopt the rights plan which was adopted on April 23; and the second challenge has to do with the duty of the directors in passing upon that whether they breached their duties of using business judgment, acting as fiduciaries, and of loyalty. It has been agreed by the parties that the matter has presently been submitted to me on the single issue of whether the adoption of the rights plan by the directors of NL Industries was *ultra vires* under New Jersey law.

The Amalgamated Sugar Company is a corporation organized and existing under

the laws of Utah with principal place of business in Utah. LLC Corporation, another plaintiff, is a corporation which is organized and existing under the laws of the state of Delaware with principal place of business in Texas. LN Partnership is a general partnership organized and existing under the laws of the state of Texas with principal place of business in Texas. NL Acquisition Corp. is a wholly owned subsidiary of Amalgamated which was formed for the purpose of making a tender offer for any or all shares of NLI common stock. NLI is a corporation organized and existing under the laws of the state of New Jersey with principal place of business in New York. It is primarily engaged in petroleum services and chemicals production.

The individual defendants are directors of NLI including Mr. Theodore Rogers, who is chairman, president and chief executive officer. The individual defendants are all citizens of states other than Delaware, Texas and Utah. There is one director, Mr. St. Clair, who is not a defendant, apparently because his presence would have destroyed diversity.

NLI in recent years has performed poorly, in terms of its own operations and in terms of the price of its stock in the market. The company has announced write-offs of nearly $250,000,000 in assets for the second quarter of 1986. Its price on the market has declined in recent years. In 1985 it traded from $9, $10, to $14.50.

On March 25 of this year Coniston Partners, with its affiliates, which then held approximately eight percent of NLI's stock, proposed to acquire NLI at a price of $16 per share in cash and securities. At the time NLI's common stock was trading at $14 per share. The board of directors of NLI apparently rejected Coniston's offer without presenting it to the NLI stockholders. NLI then on or about April 12, 1986 concluded a buy-back agreement with Coniston purchasing, I believe it was, half of the NLI shares held by Coniston and its affiliates for $14.75 per share.

The directors of NLI, apparently concerned by the possibility of another take-over threat such as that posed by Coniston, developed and adopted a restructuring plan which was announced on April 14. This plan included a reversion to NLI of excess pension funds in the amount of some $120,000,000, an initial public offering of a percentage, I believe it was 20 percent, of the stock of its subsidiary NL Chemicals, and a repurchase of NLI shares.

This repurchase was to be effected by the buy-back agreement with Coniston, which I have already discussed, and by making a self tender offer for 7-½ to 10 million NLI shares in a price range set by NLI's board of directors between $15-⅛ and $16.

NLI basically consists of two businesses: the oil service business and the chemical business. The oil service business has been in a general recession which is related to the world-wide oil glut. The chemical business has been profitable. The directors of NLI believed that its shares were under-valued in the market. The reason for this under-valuation was that it was basically regarded as an oil service company and monitored by analysts skilled in that field who did not appropriately value the chemical business. The directors were concerned that, because of this under-valuation which they perceived, the company would be vulnerable to a takeover—perhaps a takeover of a two-tier variety where control was secured through a tender for part of the shares and the takeover would be financed by part of the assets of the company, with the remaining minority shareholders being bought out for less than adequate consideration.

They feared, in short, that the value they perceived in the company, that was not presently reflected in share market price, would be realized by the acquirer and not the company's shareholders.

In March of 1986, while the Coniston interest was still alive, the NLI board considered but did not adopt a rights plan. At the NLI board meeting which was held on April 23 of this year a rights plan was presented and adopted. The directors received a memorandum from counsel outlin-

ing the plan along with drafts of the plan, of a letter to shareholders, and of a press release announcing its adoption.

Counsel's memorandum observed that the purpose of the plan was to deter take-over attempts on terms not approved by the directors. The board adopted the proposed plan on April 23 without submitting it for shareholder approval. The annual shareholders' meeting was also held that day.

Under the plan adopted by the NLI board, NLI declared a dividend of one right per share to all common shareholders of record as of May 30, 1986. These rights initially could be traded only with the shares and could not be exercised. Unless redeemed, the rights, according to the plan, extended for ten years until May 30, 1996. The rights were redeemable for five cents each until the first trigger occurred: an announcement that a shareholder held 20 percent or more of NLI common or that a tender offer was to be commenced for 30 percent or more of NLI stock.

Either of these occurrences constitutes the first triggering incident, and after either occurrence, the rights certificates were to be distributed to all shareholders. They were at that point to be nonredeemable and to be transferable on the New York Stock Exchange.

The certificates issued to a shareholder who held 20 percent or more were to bear a legend which spelled out that the rights represented by the certificates could become null and void. Once distributed, as I already noted, the rights could be traded separately from the common stock.

Under the plan each right nominally entitles the holder to purchase $1/100$th share of a newly issued junior preferred stock of NLI. To purchase a $1/100$th share of such stock, the right-holder would have to pay a $50 exercise price. This exercise price was set in this disproportionately high amount, disproportionate relative to the present value of the right, in order that it would be "out of the money."

When any of several types of transactions which constitute a second trigger, such as a merger, occur the plan's flip-in provisions, under Section 11, or flip-over provisions, under section 13, will be activated.

Section 11 of the plan is the flip-in. It comes into play if NLI is the surviving entity in a merger with the 20 percent shareholder. If any one of numerous business transactions occurs or if an acquiring person's stake or the 20 percent shareholder's stake in NLI is increased by 1 percent by reason of a reverse stock split or some other corporate transaction, under the flip-in provision, after trigger, and this is the second trigger, all right's holders, except the acquiring person, are entitled to purchase $100 worth of NLI common stock for $50, and the acquiring person's rights become void.

This process self-evidently effects a substantial dilution of the acquiring person's equity in NLI and of his voting power. It will have a similar effect on the equity and voting power of other common stock shareholders who have transferred their rights.

Under section 13 of the plan, which is the flip-over provision, if an acquiring person merges or otherwise combines with NLI and the acquiring person is the surviving entity, each right would flip-over into a right to buy $100 worth of the acquiring company's stock at a price of only $50.

Once the first trigger occurs, and rights have been triggered, the dilution with respect to a flip-in would occur with respect to subsequent acquiring persons, even white knights. NLI apparently acknowledges that upon the issuance of the rights, the rights plan precludes NLI from being able to negotiate with third persons or complete a transaction for the entire company with a white knight.

The plan is not triggered if the entity purchasing 20 percent of NLI stock is NLI itself or one of its subsidiaries or its employee benefits plan.

Because the thrust of this plan, once the original trigger takes place, and it has tak-

en place, is so important to my resolution of the issue before me, I am going to discuss the operation of the flip-in provision and of the way in which, if the second trigger is pulled, it subjects an acquiring person's interests, voting rights and equity, to discriminatory dilution.

If the flip-in is triggered when NLI's common stock is trading at $12.50 per share, each NLI right-holder, except for the acquiring shareholder, will be entitled to buy eight additional common shares with a value of $100 for the exercise price of $50 and thereby obtain eight additional common shares and eight additional votes. However, the acquiring person, the 20 percent shareholder whose rights have been voided, will not be able to obtain any additional shares in the same manner. Thus the triggering of the flip-in provision would allow all common shareholders who hold rights, except the acquiring shareholder, the 20 percent shareholder, to have nine votes for each common share previously owned. The 20 percent shareholder would have the same number of shares and the same number of votes as he had before. His voting rights therefore would have been substantially diluted.

This flip-in provision similarly subjects an acquiring person's equity to discriminatory dilution. Assume that the flip-in is triggered when there are 60,000,000 common shares outstanding, the market price is $12.50 per share and all rights-holders, other than the acquiring person, exercise their rights by buying eight shares for each right at $6–¼ per share. Under these circumstances, if the acquirer had paid $450,000,000 for 60 percent of the outstanding common shares of NLI, the triggering of the flip-in provision would reduce the acquirer's equity to $279,000,000.

A letter to shareholders signed by Mr. Theodore Rogers, the president and chairman, stated that a principal purpose of the NLI rights plan was to deter "any attempt to acquire the company in a manner or on terms not approved by the board."

On June 11 of this year, NLI's stock price on the market fell below $12. On June 18 Harold Simmons, who was the chairman of Amalgamated, wrote to NLI proposing to buy all NLI shares for $15 or all shares that had been tendered to NLI at $15–¼.

On June 24, 1986 Mr. Simmons asked the NLI board of directors to redeem the rights which had been issued under the rights plan in order to preserve the company's flexibility in view of the plaintiffs' interest in purchasing more shares and crossing the 20 percent threshold established under the rights plan. NLI's board met on June 25. It cancelled its self-tender offer; it authorized the sale of 18 percent of NL Chemicals' stock; it rejected Mr. Simmons' proposals and his request that the rights be redeemed; and it explained to shareholders that "underlying these board actions is its belief that the inherent value of the company's component businesses is significantly greater than the price proposed by Mr. Simmons."

On June 25 this suit to enjoin the operation of NLI's rights plan was filed.

On June 30 the plaintiffs announced that their holdings of NLI common exceeded 20 percent. This constituted the first trigger under the rights plan. (Pursuant to the agreement, previously mentioned, defendants have agreed not to distribute the rights certificates. Thus public trading in the rights separate from the common has not occurred.) The next day, plaintiffs announced that they would commence a cash tender offer for any and all NLI shares including rights and later dividends for $15–⅛ per share. That tender offer was formally commenced on July 3rd.

Plaintiffs conditioned their tender offer on judicial invalidation of the Pill. Another principal condition was financing. The plaintiffs have represented that financing commitments are conditioned on the Pill's invalidation.

The NLI board of directors characterized plaintiffs' offer on July 11 as financially inadequate. On July 14 the NLI board decided to cancel its sale of NL Chemicals' stock and to spin off 100 percent of NL

Chemicals as a dividend to common shareholders. Its stated purpose for this spin-off was to enhance shareholder values in the face of plaintiffs' offer.

The board authorized distribution of depositary receipts representing shares of NLI's newly created Series C preferred stock in order to provide a functional equivalent to NL Chemicals' common and to allow public trading therein prior to the time the common stock of NL Chemicals would be issued.

In response to NLI's spin-off the plaintiffs supplemented their offer on July 25, stating that they would accept tenders of NLI common coupled with rights but not depositary receipts for $3.50 per share, and that they would accept tenders of such units plus depositary receipts at $15–⅛. They also reserved the right to return the depositary receipts.

The tender offer was due to expire by operation of law at midnight on July 31. At that time all tenders were to be in and the plaintiffs would have been free to purchase tendered shares.

Pending decision on this motion for preliminary injunction it is my understanding that the plaintiffs have extended their offer on a day-to-day basis.

At the heart of this controversy is the validity of the flip-in and flip-over provisions of the NLI plan.

The parties agree that New Jersey law governs. Plaintiffs have principally relied on two federal district court cases construing New Jersey law. See *Minstar Acquiring Corp. v. AMF Inc.*, 621 F.Supp. 1252 (SDNY 1985), *Asarco Inc. v. Court*, 611 F.Supp. 468 (DCNJ 1985).

Defendants have argued that these cases do not govern this rights plan, and that instead this court should rely on a Second Circuit decision analyzing New Jersey law and that it should look to Delaware law as well. See *Treadway Cos. Inc. v. Care Corp.*, 638 F.2d 357 (1980), *Moran v. Household Intern.*, 500 A.2d 1346 (Del. 1985), *Revlon v. MacAndrews & Forbes*, 506 A.2d 173 (Del.1986), *Dynamics v. CTS*,

Fed.Sec.L.Rep. (CCH), para 92, 736 (N.D. Ill. April 17, 1986.)

A preliminary injunction may only be issued if the party seeking that injunction establishes either a likelihood of success on the merits or a seriously litigated issue with a balance of hardship tipping in the plaintiffs' favor.

On either showing the party seeking a preliminary injunction must also establish probable irreparable harm.

With respect to the merits, the plaintiffs urge this court to find that the rights plan adopted by NLI is not valid under New Jersey law for three reasons: That New Jersey law forbids discrimination among shareholders of the same class and series, that New Jersey law forbids unreasonable restraints on share alienation, and that New Jersey law forbids any device by which the board is given veto power over hostile offers unless there has been shareholder approval.

■ I find that the rights plan, and in particular the flip-in provision of that plan, since principal focus has been on that provision in the course of the presentation of this case, is *ultra vires* as a matter of New Jersey Business Corporation law. The flip-in effects a discrimination among shareholders of the same class or series. Under the plan the voting rights and the equity of an acquiring shareholder are diluted upon a triggering event. I have already discussed the arithmetic of that dilution. It is a dilution that affects voting power and it is a dilution that affects equity.

New Jersey law clearly does not allow discrimination among shareholders of the same class and series. New Jersey Business Corporation Act, sections 14A: 7–1 and 7–2 permit differences in voting rights between classes or series of stocks. Section 7–1(1) empowers New Jersey corporations to create and issue shares of stock. It states that "each class and series may have such designation and such relative voting, dividend, liquidation and other rights preferences, and limitations as shall

be stated in the certificate of incorporation."

Section 7–1(2)(f) provides that "when so authorized in its certificate of incorporation" a corporation "may issue classes of shares in series of shares of any class," and then (f) "lacking voting rights or having limited voting rights or enjoying special or multiple voting rights."

After reviewing this statutory scheme, the federal court in *Asarco* concluded that "while the Business Corporation Act permits changes of voting rights as between classes or series of stock, it does not permit an amendment under section 7–2 which would redistribute voting power within a class or series."

According to the court in *Asarco*, the issuance of stock that has this effect "would be *ultra vires* and void."

*Asarco* rejected as *ultra vires* the Asarco board's amendment of the certificate of incorporation providing for issuance of Series C preferred stock. The purpose of issuing the new stock was to prevent a takeover.

The amendment adopted by the board provided that a dividend of ¹⁄₁₀ of a share of Series C for each share of common be issued to all common shareholders. Initially in that case Series C shares possessed no voting rights except on matters related to preferential rights. However, if any shareholder became the beneficial owner of more than 20 percent of either Asarco's common stock or its Series C, then each ¹⁄₁₀ of Series C owned by anyone other than the 20 percent holder would have five votes in all matters submitted to common stockholders.

The Series C shares owned by the 20 percent holder would have no voting rights.

Judge Debevoise reasoned that "Asarco's board created a situation where the same class of stock will have different voting rights. This can be viewed as occurring with respect to two classes of stock. The new preferred will have differing voting rights depending on whether it is held by a 20 percent holder. The new preferred is piggy-backed onto the outstanding common stock, and therefore there has also been created a situation in which certain common stockholders,—those who acquire 20 percent of the shares,—will have their voting power diluted five-fold vis-a-vis the other common stockholders. This is to be distinguished from a situation where a new class of stock has superior voting rights to all common stockholders or to all stockholders holding some other class."

Judge Debevoise concluded that while the Business Corporation Act of New Jersey permits changes of voting rights as between classes or series of stock, it does not permit an amendment under section 7–2 which would redistribute voting power within a class or series of stock.

In so concluding Judge Debevoise expressly found that a decision by the Delaware Supreme Court, *Baker v. Providence & Worcester Co.*, 378 A.2d 121 (Del. 1977), upholding an original certificate of incorporation with a class of stock with differing voting rights, would not be followed in New Jersey. He relied on the reasoning of the Delaware Chancery Court in *Telvest Inc. v. Olsen*, slip op. # 5798 (3/8/79) [Available on WESTLAW, DE–CS database] which found a common stock dividend that in effect altered the voting rights of the common shareholder with regard to certain business conditions, and which was issued without shareholder approval, to be impermissible.

Defendants have argued that the application of *Asarco* to the NLI rights plan is inapposite. Because *Asarco* only involved voting rights of a class of stock, its reasoning should not extend to the NLI rights plan, according to the defendants.

They assert that Section 14A:7–7 of the New Jersey Business Corporation Act and not 14A:7–1 is applicable to the NLI plan. Section 14A:7–7 authorizes corporations to issue rights to purchase shares of stock from the corporation "for such consideration, and upon such terms and conditions as may be fixed by the board."

The defendants assert that there is nothing in that section, 14A:7–7, that prohibits

the terms and conditions fixed by the board from being discriminatory.

I do not accept that broad reading of 14A:7–7. Such a reading would allow the boards of directors of corporations to circumvent the provisions of 14A:7–1. It is axiomatic that one cannot read one section of a statute to accomplish an end that is impermissible under another section of the statute.

It is interesting to note in reviewing various of the rights plans that have in various contexts been proposed that many of their essential elements are the same, and there seems to be an immediate return to the drawing board when a given type of rights plan, such as the one in *Asarco*, has been found not to pass muster, for purposes of redesigning around the prohibiting decisions.

The basic arithmetic in *Asarco* and in the NLI plan is the same. Given a trigger, there suddenly exist votes that did not exist before which have the effect of upsetting normal corporate structure.

I have some further reservations concerning the applicability of 14A:7–7 to NLI's rights certificates. Those rights certificates or those rights were initially issued as a dividend to common shareholders. It is axiomatic under the laws of New Jersey, certainly, and most other jurisdictions, that dividends paid to shareholders of a class must be the same to each shareholder. What this plan does is effect a transposition of these dividends and of their meaning both when a first and second triggering event has occurred.

The 20 percent shareholder, and all other shareholders, received a dividend. Once there is a second trigger what they received changes in value according to whom the shareholder is. I do not believe that this is permissible, but I do not only rely on this.

What the plan also provides is that once these dividends have been received and somebody acquires 20 percent of NLI's common stock, certificates issue, which do not partake of the nature of the dividend that was originally paid. The certificates in the hands of the acquirer differ from those in the hands of all other shareholders. The certificates received by all shareholders, other than the acquiring shareholder, have no legend. The certificates received by the acquiring shareholder have a legend warning that they may be void or voided. The nonacquiring shareholders have therefore received through this dividend something which theoretically, at least, is transferable. The 20 percent shareholder has received something which in all probability could under no circumstances be transferred.

*Agnew v. American Ice Company*, 2 N.J. 291, 66 A.2d 330, 335 (1949), stated that it is fundamental that in the declaration of dividends "arbitrary discrimination ... is inadmissible ... as to members of the same class." See *Klein v. Greenstein*, 24 N.J.Super. 348, 94 A.2d 497 (1953), *Scott v. Lorillard Co.*, 108 N.J.Eq. 153, 154 A. 515 (1931). Such discrimination did occur here.

I find *Asarco's* analysis and its conclusions quite apt in application to the dividends involved in the NLI rights plan. In *Asarco*, new preferred stock with possible voting provisions to be triggered in the future were piggy-backed onto the Asarco common stock, and when triggered, would create a discriminatory dilution in the voting power of a 20 percent common stockholder.

The rights issued to the common shares in NLI were piggy-backed onto those shares, and upon a triggering event they would have the effect of diluting the voting power and the equity of the 20 percent shareholder.

I do not see that the transferability of those certificates, once the certificates themselves were issued, changes this except that it creates more dire a situation because it promises a dilution with respect to not only the voting power and the equity of the 20 percent shareholder, but also of all other common shareholders who have advertently or otherwise transferred their rights prior to the second trigger.

In *Minstar Acquiring Corporation v. AMF*, Judge Lowe relied on the *Asarco* case in analyzing a rights plan. She found that a rights plan, where nontransferable rights which were issued to shareholders of the same class discriminated against some of those shareholders, was invalid under New Jersey law.

The cases to which the defendants have directed me for authority that the flip-in provision is legal have not persuaded me.

Defendants argue that *Treadway*, which is a Second Circuit case, correctly enunciates New Jersey law and confirms that New Jersey law permits a New Jersey corporation to adopt discriminatory devices even where the purpose is to deter a takeover. *Treadway* was not this case.

The plaintiff in *Treadway* challenged the board's sale of 230,000 shares of newly issued common stock to a white knight, thereby diluting plaintiff's interest in Treadway and deterring a hostile takeover.

The sale in *Treadway* had the same effect, so far as voting rights are concerned, on the plaintiff who was proposing to take over, and on all other shareholders. It had, furthermore, no dilution effect so far as equity is concerned.

In the NLI rights plan there is a discrimination between shareholders and it is only the acquiring person's voting power and equity which is diluted aside from the inadvertent dilution with respect to shareholders who have transferred their rights.

Similarly the rights plan challenged in *Moran v. Household* did not contain a provision for voiding certain rights and increasing others. It entitles stockholders to one right per common share, which right on a merger would entitle the rights-holder to purchase $200 worth of common stock of the acquiring company for $100. Nor is *Dynamics Corporation* controlling of the issue before me since that relies expressly on Delaware law.

I do want to return to *Moran* because the defendants have relied so strongly on *Moran*, a decision of the Delaware Supreme Court, as being the bellwether in this area of defensive rights plans.

In *Moran* the familiar outlines of so many of these rights plans was seen in the sense first that there was a trigger when 20 percent of the company's stock was acquired or when a tender was made for 30 percent. Each right issued was a right to $\frac{1}{100}$th of a preferred share.

There was in that case, so far as I can see, only a flip-over. If there was a merger, the person holding the preferred was entitled to buy $200 worth of the common stock of the acquiring company for $100.

The *Moran* court dealt at some length with the business judgment exercised by the directors, but it first addressed the question of whether the directors could adopt the plan, whether they had the power to adopt the plan. *Moran's* answer was yes.

It was argued by the tender offeror in that case that the rights plan at issue was not authorized by any provision of Delaware corporate law. The court found that it was authorized by the Delaware equivalent of New Jersey corporate law 14A:7-7. It was also argued that the board was not authorized to usurp the shareholders' rights to receive hostile tender offers and that the board was unauthorized or not authorized fundamentally to restrict the shareholders' rights to conduct a proxy contest.

It also dealt with what it characterized as a sham argument, the argument that the right was designed never to be exercised. The court in *Moran* said the right could be exercised upon the happening of a triggering event. In this case the right never can be exercised. Obviously the first trigger can be pulled because it has been pulled. The Simmons' interests are a 20 percent interest. The first trigger has been pulled, but if anything is clear from the materials that have been submitted on this motion, and indeed from the colloquy from both sides and the argument on this motion, no tender offeror will ever offer in the face of this rights plan.

The defendant has conceded this: if this plan is found to be valid no one will tender, and that means that no one will tender this year or next year or at anytime between now and May 30, 1996.

The preferred stock provided for in the NLI plan is "out of the money"; no one expects that anyone will exercise a right to the preferred stock. The other rights spelled out in the rights plan here can never be reached because no one in his right mind will ever tender in the face of this plan.

The court in *Moran*—and I regard this as a key distinction between what was before that court and what what is before this court—stated "we do not view the rights plan as much of an impediment on the tender offer process."

It was argued to the *Moran* court that the board of directors was not authorized to usurp the stockholders' right to receive tender offers by changing Household's fundamental structure. And the court said that it concluded "that the rights plan does not prevent stockholders from receiving tender offers and that the change of Household's structure was less than that which results from the implementation of other defensive mechanisms upheld by various courts."

My conclusion and finding in this case is that the rights plan does prevent stockholders from receiving tender offers and the change of NLI's structure, which at least theoretically would be effected by this rights plan, is more extreme than any that have been analyzed in other cases.

The *Moran* court, in upholding the rights plan before it, concluded that there were many ways around that plan. It suggested that the tender offeror could tender with a condition that the board redeem the rights. Well, that was a possibility in this case, and indeed the tender offeror in this case did request the board to redeem the rights and the board refused. At this stage the 20 percent trigger having been pulled, the board has no power for the next ten years to redeem the rights.

A second possibility that the court in *Moran* saw to circumvent the plan was to tender with a high minimum condition of shares and rights to be submitted. I haven't worked out the precise arithmetic of it, but in this case such a tender would be in the neighborhood, I believe, of requiring a 95 percent return, so high that it is "out of the money".

The next possibility that the court in *Moran* saw was tendering, and soliciting consents to remove the board and redeem the rights. That is not a possibility in this case because the rights are not redeemable.

A fourth possibility that the court in *Moran* saw was that the tender offeror could acquire 50 percent of the common shares and cause the corporation to self-tender for the rights. That is not a possibility in this case.

The fifth possibility the court saw as a way around the rights plan in *Moran* was that the tender offeror could form a group of shareholders constituting, up to the 20 percent limit, constituting some 19.9 percent of the common stock and could then solicit proxies for consents to remove the board and to redeem the rights. Since the rights are not redeemable, that is scarcely a possibility here.

The *Moran* case was dealing with what is permissible and what is impermissible with respect to tender offers. Underlying that decision is an implicit and almost explicit assumption that Delaware law permits tender offers. The *Moran* court said that "when the Household board of directors is faced with a tender offer and a request to redeem the rights, they will not be able to arbitrarily reject the offer."

Now, in this case the board of directors did reject the offer. We are not currently considering the question of whether that decision was an arbitrary one or not because the question of the judgment exercised is not presently before me. But we do have a situation before me where no tender offer is possible.

If this board of directors instead of adopting this rights plan had adopted a

rule that no tender offers will be permitted, it would clearly be beyond their power, and yet that is the situation that exists today, that there is no tender offer possible by anyone within the next ten years.

In structuring the rights plan, the board of directors, advisedly or otherwise, abdicated future control or responsibility with respect to tender offers by simply making them impossible.

The *Moran* court also stated that the rights plan before it was no more of a structural change than any other defensive mechanism that might be adopted by a board of directors in the face of a hostile tender offer. The court said that the rights plan did not destroy assets and that it did not result in the outflow of money from the corporation, nor did it impair its financial flexibility.

With respect to this rights plan, the flexibility of the board is certainly impaired and the shareholders have no flexibility that the board does not have.

The *Moran* court also said that the plan before it did not dilute earnings per share and that there were no adverse tax consequences for the corporation or for its shareholders.

In this situation the plan certainly dilutes earnings per share so far as the acquirer is concerned. I cannot comment with respect to tax consequences.

The *Moran* court dealt with the claim that the rights plan before it altered structure more than do other defensive mechanisms because "it is so effective as to make the corporation completely safe from hostile tender offers." It found that claim was without merit.

In this case that sort of structural change has been effected. The corporation is completely safe from tender offers for ten years.

Defendants have argued that this whole problem was created by the plaintiffs in triggering the rights plan by buying up to and through the 20 percent limit, and they argue since the plaintiffs created this situa-tion that is now before the court, they cannot be heard to complain.

There was a prior decision that was made that made that trigger an irreversible trigger and that was the board's decision not to reserve the right to redeem with respect to a 20 percent shareholder.

I am faced now with a 20 percent shareholder who wishes to tender and cannot tender so long as this rights plan is in place and I will deal with it on that basis.

■ I find that there is a probability of success on the merits so far as the plaintiffs' application to void the rights plan is concerned. I further find that there is irreparable harm to the plaintiff in that it cannot present to the shareholders of NLI, in any meaningful way, its offer so long as this rights plan is in place. If the rights plan stays in place, the plaintiff obviously cannot proceed. This is a disservice not only to the plaintiff, which constitutes irreparable harm, it is a disservice to the shareholders who are entitled to exercise their own value judgments with respect to the worth or lack of worth of the offer from these plaintiffs.

Beyond that, however, there is another consideration of irreparable harm and that is to the shareholders in the long run, quite irrespective of this particular set of plaintiffs.

There has not only been a chilling effect set down for ten years on the possibility of any tender offer with the beneficial effects that such offers may have with respect to the price of the stocks held by the share-holders, but the knowledge itself that there cannot be such a tender offer may have a chilling effect on the price of the stock.

There is irreparable harm to the plaintiffs and to the other shareholders because the plaintiffs' opportunity to carry through with its tender offer is currently being impeded by an unlawful device, to wit, the rights plan.

I will now deal with the motion for a stay or dismissal. I deny that motion.

I have jurisdiction over this case. There is venue in this court, there is a general

1240

obligation on a federal court to accept cases, and the rights plan itself is, I believe, governed by New York law. The defendant itself has argued in the course of this case that the laws of most jurisdictions with respect to rights plans are the same. I consider myself and I certainly consider my Court of Appeals as adequate to interpret New Jersey law.

There is a lack of identity between the parties in this action and the parties in the New Jersey action, and the issues in the two actions are not the same.

Based on these findings and conclusions the defendants NL Industries Inc. and its directors, agents, employees, and each of them are preliminarily enjoined from taking any steps, including the distribution of rights certificates, to implement or otherwise utilize the rights plan adopted April 23, 1986 pending final adjudication in this matter.