**GEORGIA–PACIFIC CORPORATION, et al., Plaintiffs,**

v.

**GREAT NORTHERN NEKOOSA CORPORATION, et al., Defendants.**

**Civ. No. 89–0264 P.**

United States District Court, D. Maine.

Jan. 16, 1990.

See also 727 F.Supp. 31.

David A. Soley and Robert H. Stier, Bernstein, Shur, Sawyer and Nelson, Portland, Me., and Stuart J. Baskin, Shearman & Sterling, New York City, for plaintiffs.

Robert A. Moore, Verrill & Dana, Portland, Me., and Bernard W. Nussbaum, Wachtell, Lipton, Rosen & Katz, New York City, for defendants.

### MEMORANDUM AND ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

This action arises out of Georgia–Pacific's attempt to take over the Great Northern Nekoosa Corporation by a cash tender offer commenced on October 31, 1989. In its complaint Georgia–Pacific seeks declaratory and injunctive relief against certain impediments to Georgia–Pacific's offer, which has been twice rejected by Great Northern's Board of Directors. These allegedly unlawful impediments include Great Northern's "poison pill" stock purchase rights plan. Before the Court now is Georgia–Pacific's Motion for Partial Summary Judgment on the grounds that a portion of Great Northern's rights plan, the so-called "flip-in" provision, violates the Maine Business Corporation Act, 13–A M.R.S.A. § 101 *et seq.*, and is, therefore, void. The motion has been thoroughly briefed, and the Court has heard oral argument on it by the parties and counsel for the shareholders.

The challenged rights plan, adopted by Great Northern in October 1988, provided for the declaration of a dividend of one preferred share purchase right for each outstanding share of common stock. Each right entitles the holder to purchase one one-hundredth of a share of Series A Participating Preferred Stock for $150. The Great Northern Board may redeem the

rights for one cent each at any time prior to the acquisition by any person of 20% or more of Great Northern's outstanding common stock.

The flip-in provision, which is designed to combat unapproved takeover attempts, only becomes effective if an acquiring person accumulates 20%[1] or more of Great Northern's outstanding common stock. If that occurs, the rights become rights to buy shares of Great Northern's common stock at a 50% discount from the market price. Thus, under the plan, the rights holder can buy $300 worth of Great Northern common stock for $150. The rights held by an acquiring person who crosses the 20% threshold become void so that he is not entitled to buy common stock at a discount. While the rights trade with the shares of common stock initially, they are evidenced by separate certificates and may be traded separately after a triggering date which relates to the accumulation of 20% of the common stock by an acquiring person.

Great Northern's Form 8–K filing with the SEC describes the anti-takeover effect of the rights plan as "caus[ing] substantial dilution to a person or group that attempts to acquire the Company on terms not approved by the Company's Board of Directors."[2] Georgia–Pacific argues here that these anti-takeover dilution effects can only be achieved by treating the acquiring company and its shares differently from other shareholders of the same class of stock and that such discrimination violates the Maine Business Corporations Act (MBCA).

> Section 501(1) of the MBCA provides: Each corporation shall have power to create and issue the number of shares stated in its articles of incorporation. Such shares may be divided into one or more classes, any or all of which classes may consist of shares with par value or shares without par value, with such designations, preferences, limitations and relative rights as shall be stated in the articles of incorporation. The articles of incorporation may limit or deny the voting rights of, or provide special voting rights for, the shares of any class to the extent not inconsistent with this Act.

13–A M.R.S.A. § 501(1). Section 501 has never been construed by the courts of Maine. Georgia–Pacific, however, argues that because the statute expressly permits corporations to discriminate between classes of stock but the statute is silent concerning discrimination within classes, different treatment of individual shareholders within any class is forbidden.

In support of its construction of the statute, Georgia–Pacific cites *East Boothbay Water District v. Inhabitants of Town of Boothbay Harbor,* 158 Me. 32, 36–37, 177 A.2d 659 (1962). In that case the Law Court stated:

> [I]n all grants by the government to individuals or corporations, of rights, privileges and franchises, the words are to be taken most strongly against the grantee, contrary to the rule applicable to a grant from one individual to another. Another rule is, that one who claims a franchise or exclusive right or privilege in derogation of the common rights of the public, must prove his title thereto by a grant clearly and definitely expressed, and cannot enlarge it by equivocal or doubtful provisions, or probable inferences. "Every reasonable doubt is to be resolved adversely. Nothing is to be taken as conceded but what is given in unmistakable terms, or by an implication equally clear. The affirmative must be shown. Silence is negation, and doubt is fatal to the claim. This doctrine is vital to the public welfare." *[Northwestern] Fertilizing Co. v. Hyde Park,* 97 U.S. [659] 666 [24 L.Ed. 1036 (1878)].

*Id.* (quoting *The Rockland Water Co. v. The Camden and Rockland Water Co.,* 80

---

**1.** The rights plan does not take effect, however, if the acquiring company obtains more than 80% of the outstanding common shares.

**2.** Judge Posner describes the operation of poison pills in more depth and provides some commentary on them in *Dynamics Corp. v. CTS Corp.,* 794 F.2d 250, 255 (7th Cir.1986), *rev'd on other claims,* 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987).

Me. 544, 563, 15 A. 785 (1888). Georgia–Pacific also urges upon the Court the more general old construction chestnut *"expressio unius est exclusio alterius,"* i.e., the expression of one thing means the exclusion of another.

Having read *East Boothbay Water District,* the cases upon which it relies, and its slender progeny, the Court is satisfied that the rule of statutory construction it sets forth pertains to corporations organized or chartered under special laws, such as those for public utilities, which provide rights, privileges and immunities derived from the state. The Court, therefore, declines to accept the *East Boothbay* rule as governing this case brought under the general corporation law set forth in the MBCA. The Court also cannot accept the proffered maxim as the fundamental rule of statutory construction which must determine this statute's meaning. Maine courts have made clear that it is a "handy tool" to be used "at times" in ascertaining the intention of the Legislature. *Wescott v. Allstate Insurance,* 397 A.2d 156, 169 (Me. 1979).

The Law Court has repeatedly stated that its "cardinal rule" of statutory construction is to ascertain and effectuate the intent of the Legislature. *State v. Hudson,* 470 A.2d 786, 788 (Me.1984); *State v. Edward C.,* 531 A.2d 672, 673 (Me.1987). The best means for doing this is through examination of the statutory language. *State Farm Mutual Automobile Insurance Co. v. Universal Underwriters Insurance Co.,* 513 A.2d 283, 286 (Me.1986). Obviously, therefore, if section 501 of the MBCA had expressly prohibited poison pills or discrimination among shareholders, the Court's task would be easy. There is no such express prohibition, however. Thus, in order to determine the Legislature's intent with regard to the asserted anti-discrimination provision of section 501, the Court must look to the statutory scheme as a whole so that all of the provisions of the MBCA are read in harmony and are effec-

tuated. *Faucher v. City of Auburn,* 465 A.2d 1120, 1124 (Me.1983).

Corporations organized under Maine law are specifically empowered to create rights. Section 508 provides in pertinent part:

1. Unless this section or the articles of incorporation otherwise provide, a corporation, by action of its board of directors, may create and issue, whether or not in connection with the issue and sale of any of its shares or other securities, rights or options entitling the holders thereof to purchase from the corporation shares of any class or classes, whether authorized but unissued shares, treasury shares, or shares to be purchased or acquired by the corporation. The consideration and payment for shares to be purchased under any such right or option shall comply with the requirements of sections 506 or 507.

2. Such rights or options shall be evidenced by an instrument or instruments in such form as may be approved by the board of directors, which shall set forth or shall incorporate by reference the terms and conditions upon which, such shares may be purchased from the corporation upon the exercise of any such rights or options.

. . . .

In addition to permitting the creation of rights, the statute specifically allows the corporation to set the terms and conditions for the exercise of the rights to purchase stock. Georgia–Pacific argues, however, that this express grant of the authority to issue rights is limited by the implicit prohibition against discrimination within shares of the same class set forth in section 501. The Court disagrees.

Because there is no Maine law on the subject, the Court will look to constructions of similar statutes by other states. The Court notes, too, that in a very recent case, the Law Court looked to Delaware's interpretation of its similar corporation laws as a guide to construction of the MBCA. *See In re McLoon Oil,* 565 A.2d 997, 1001–02 (Me.1989).[3] Under an analog to section

---

**3.** In *McLoon* the Law Court explicitly refers to Delaware law concerning one section of the

subject statute, then takes great pains to demonstrate that Maine law concerning valuation un-

501, Del.Code Ann. tit. 8, § 151, the Delaware courts have long distinguished between discrimination among shareholders and discrimination among shares, finding the former permissible:

> In the final analysis, these restrictions are limitations upon the voting rights of the stockholder not variations in the voting powers of the stock per se. The voting power of the stock in the hands of a large stockholder is not differentiated from all others in its class; it is the personal right of the stockholder to exercise that power that is altered by the size of his holding.

*Providence and Worcester Co. v. Baker,* 378 A.2d 121, 123 (Del.1977). Moreover, in *dicta* a more recent Delaware case found statutory authority for a discriminatory note purchase rights plan. *Revlon Inc. v. MacAndrews and Forbes Holdings, Inc.,* 506 A.2d 173, 180 (Del.1986).

The Court is satisfied that if the Maine courts were to look to Delaware law for guidance in the construction of the MBCA, as they have so recently, they would find authority for the issuance of the Great Northern rights plan in section 508, and they would not find the flip-in provision invalid under section 501. *See Dynamics Corp. v. CTS Corp.,* 637 F.Supp. 406, 408–09 (N.D.Ill.1986), *aff'd on other grounds,* 794 F.2d 250 (7th Cir.1986), *rev'd on other claims,* 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987); *Dynamics Corp v. CTS Corp.,* 805 F.2d 705, 718 (7th Cir.1986).[4] The Great Northern rights plan makes clear that it involves the issuance of rights, which can, under certain circumstances, trade separately, and not a second class of stock. *See CTS,* 637 F.Supp. at 408. Also, under the plan the rights attach to *all* shares of common stock. The fact that a shareholder may take certain actions that affect its holding of the rights does not make the rights into a new class of stock. *Id.*

Georgia–Pacific urges the Court to follow a line of cases from other jurisdictions holding rights plans similar to Great Northern's illegally discriminatory under statutes similar to section 501. *See, e.g., Amalgamated Sugar Co. v. NL Industries Inc.,* 644 F.Supp. 1229 (S.D.N.Y.1986) (construing New Jersey Corporation Act); *Asarco Inc. v. Court,* 611 F.Supp. 468 (D.N.J. 1985) (construing New Jersey law); *West Point–Pepperell, Inc. v. Farley Inc.,* 711 F.Supp. 1088 (N.D.Ga.1988) (construing Georgia law); *Bank of New York Co. v. Irving Bank Corp.,* 142 Misc.2d 145, 536 N.Y.S.2d 923 (N.Y.Sup.Ct.1988) (construing New York law); *R.D. Smith & Co. v. Preway Inc.,* 644 F.Supp. 868 (W.D.Wis.1986) (construing Wisconsin law); *Spinner Corp. v. Princeville Development Corp.,* Civ. No. 86–0701 (D.Haw. October 31, 1986) (construing Colorado law). The Court recognizes that there is a significant split of authority on the issue.

Most of the cases cited by Georgia–Pacific rely at least in part on *Amalgamated Sugar Co. v. NL Industries,* 644 F.Supp. 1229, a case construing New Jersey law.[5] Maine courts do not seem to have looked to New Jersey cases as aids to construing the MBCA. Also, as Great Northern has point-

---

der the statute is entirely compatible with subsequent Delaware law and that the court agrees with the Delaware Supreme Court's most recent explication of the subject. *McLoon,* 565 A.2d at 1003–05.

**4.** The *CTS* cases involved two separate poison pills adopted by CTS, an Indiana corporation. In evaluating the pills and finding them not illegally discriminatory under Indiana law, both the district court and the court of appeals looked to Delaware law, which had previously provided guidance in the construction of Indiana corporate law.

**5.** The Court in *Amalgamated Sugar* relied on *Asarco,* 611 F.Supp. 468, which also construed

New Jersey law. The only other case which does not expressly rely, at least in part, on *Amalgamated Sugar* for the proposition that flip-in provisions which discriminate between shareholders are illegal is *West Point–Pepperell,* 711 F.Supp. 1088. That case construes prior Georgia law in a way that is completely contrary to the current express intent of the Georgia Legislature. In the comment to O.C.G.A. § 14–2–601, Georgia specifically adopts Delaware's approach permitting provisions that treat holders of shares of the same class differently and rejects New Jersey's approach prohibiting distinctions made on the basis of the identity of the shareholder.

ed out, the cases cited do not represent statements of the current law on the issue. The state legislatures in each of the states whose statutes were construed in the cases advanced by Georgia–Pacific have since amended their corporations statutes to make explicit their authorization of poison pill flip-in provisions. Many of those legislatures, either through use of retroactive effective dates or statements of legislative intent, have made plain that the courts' decisions finding illegal discrimination in rights plan flip-in provisions had misconstrued the legislative intent of the statute. Although this Court is clearly not bound by the legislative pronouncements of other jurisdictions, the teaching to be gleaned from the sequence of events in those jurisdictions is obvious: the Court must carefully discern and faithfully apply the legislature's intent when construing the MBCA.

The most important reason that the Court feels more comfortable accepting the Delaware rather than the New Jersey line of cases as a guide to construing the MBCA is that Delaware's law most aptly reflects what this Court views as the Legislature's intent in enacting the MBCA. The Law Court has recently reiterated that one of the purposes behind the enactment of the MBCA "was to afford a corporation 'the greatest possible flexibility with its structures and procedures.'" *McLoon Oil,* 565 A.2d at 1001 (*quoting Maine Proposed Business Corporation Act* vii (1971)).

In an opinion examining a similar discrimination claim under Indiana's similar anti-discrimination statute, the court in *CTS* pointed out:

> If the statute is read in the manner suggested by [plaintiff], no Indiana corporation will be able to adopt a poison pill. The essence of the poison pill is that the acquisition by one shareholder of a specified fraction of the company's stock gives other shareholders—not the acquiring shareholder—certain rights, here the right to exchange one's shares for $50 debentures. Allow the acquiring shareholder to exercise those rights, and the poison pill becomes a corporate suicide act. The case would be different if the poison pill singled out [plaintiff] and

stripped its share of rights pertaining to other shareholders' shares. But the poison pill will strip rights from any shareholder who acquires 28 percent of the shares, and [plaintiff] is not the only shareholder who could do so. The statute was not designed to outlaw the poison pill yet that is the reading [plaintiff] seeks to impress on it.

*Dynamics Corp. v. CTS Corp.,* 805 F.2d at 718. Similarly, the reading of section 501 to prohibit discriminatory treatment of shareholders in a rights plan would effectively outlaw poison pills in Maine. Denying Maine corporations access to one of the most common defensive measures used in corporate takeover battles is the antithesis of affording corporations "the greatest possible flexibility with [their] structures and procedures." *McLoon Oil,* 565 A.2d at 1001. The construction put forward by Georgia–Pacific, therefore, would frustrate the Legislature's intent in enacting the MBCA.

Although the Legislature did not have takeover defenses specifically in mind when it enacted sections 501 and 508 in 1972, it clearly did contemplate a changing corporate climate that would necessitate flexibility in corporate structures and procedures. Thus, a reading of section 501 that would place rigid restrictions on the authority to issue rights set forth in section 508 cannot be correct. The Court notes, too, that the Maine Legislature recently enacted an anti-takeover statute, indicating its continuing commitment to corporate flexibility through the use of defensive mechanisms. The Court must look to the statute as a whole when determining the meaning of one of its parts. It would be peculiar indeed to read a statute designed to provide maximum corporate flexibility as expressly allowing one common defensive device while implicitly prohibiting another of the most common tactics. *See CTS,* 805 F.2d at 718. The Court has found nothing in its examination of the pertinent statutes and caselaw interpreting similar statutes in other jurisdictions to indicate that the Maine Law Court, if called upon to do so, would construe section 501 of the MBCA so

**812**

as to invalidate the flip-in provision of Great Northern's rights plan as illegally discriminatory.

Accordingly, it is ORDERED that Georgia–Pacific's Motion for Partial Summary Judgment be and it is hereby DENIED.

SO ORDERED.