Arlene Bell HANSON, Victor Carl Davis, Jr., and Clifford William Tagaban, For Themselves And All Others Who Are Similarly Situated, Appellants and Cross–Appellees,

v.

KAKE TRIBAL CORPORATION, Appellee and Cross–Appellant.

Nos. S–6189, S–6239.

Supreme Court of Alaska.

May 23, 1997.

Douglas M. Branson, Tacoma, WA, Fred W. Triem, Petersburg, for Appellants and Cross–Appellees.

R. Collin Middleton, Glenn E. Cravez, Jacquelyn R. Luke, Middleton & Timme, Anchorage, for Appellee and Cross–Appellant.

Before RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

## OPINION

MATTHEWS, Justice.

This is a class action in which shareholders claim that a corporation paid discriminatory dividends. The shareholders prevailed in the superior court. They appeal, claiming that the damage award was too low, that the class was too narrowly defined, and that the court's award of attorney's fees under Civil Rule 82 was too low. The corporation cross-appeals, asserting numerous defenses relating both to liability and damages. We affirm the superior court's liability ruling, vacate the damage award, and remand for recalculation of damages and for consideration of whether an immediate lump sum payment of the judgment is appropriate.

### I. FACTS AND PROCEEDINGS

Kake Tribal Corporation (Kake) is a village corporation organized under the Alaska Native Claims Settlement Act (ANCSA). Kake adopted a "Financial Security Plan" which was intended to confer financial benefits on some of Kake's shareholders. The plan was open only to original Kake shareholders who retained the one hundred shares they were issued when the corporation was organized.

The plan consisted of two programs. Original shareholders of Kake who retained all one hundred of their original shares and were between twenty-one and sixty-nine years of age were entitled to participate in the basic program. Individuals who were seventy years of age or older, and met the same shareholding requirements, were entitled to enroll in the senior program.

Under the basic program, Kake purchased a life insurance policy for each program participant. Kake retained control of the policies, was named as the beneficiary, and retained the cash surrender values. Upon the death of a participant, the life insurance proceeds were placed in an account with an investment management firm. The funds in this account were used to pay program benefits, and for other corporate purposes.

Participants who enrolled in the basic program had the option of choosing either a living benefits program or a death benefits program. The death benefits program provided for an immediate payment upon the death of the participant of $1,800 in funeral expenses and monthly payments of $225 for sixteen years to beneficiaries designated by the participant. If a participant chose the living benefits option, the participant could elect to receive $100 per month for fifteen years beginning at age sixty-five, plus a $1,000 payment to the participant's beneficiaries at the time of the participant's death. Alternatively, the living benefits participant could elect to receive $4,000 per year, starting at age sixty-eight, for three years, plus a

$1,000 payment to the participant's beneficiaries at death.

The senior program promised to pay each participant $100 per month for up to 180 months, plus $1,000 in funeral expenses at death. This program was devised because the shareholders who were seventy years of age or older were generally uninsurable.

Kake began to experience financial difficulty. After making twenty-three monthly payments to the elders—as the parties describe the participants in the senior program—the payments were suspended in 1982 due to lack of funds. On January 12, 1989, Kake paid each surviving elder $100 per month retroactive to October 1982 and each elder's estate $100 for each month from October of 1982 until the time of the elder's death. The corporation then discontinued the senior program.

Meanwhile, in 1985, Kake switched the insurers which were underwriting the basic program. This required that new insurance forms be filled out by program participants. Many shareholders failed to re-enroll with the new insurer.

The basic program was modified in 1989. Kake's liability to pay death benefits from the account with the investment management firm was limited, and the living benefits program was terminated. On March 1, 1992, the basic program was terminated.

The plaintiffs filed suit on August 31, 1990, alleging that the plan unfairly discriminated against them. Arlene Hanson and Victor Davis, Jr., are the widow and minor son of an original shareholder of Kake. When he died, fifty of his shares were transferred to Arlene and fifty passed to Victor. These shares were no longer considered to be original shares and, as a result, Arlene and Victor were not entitled to participate in the plan. Clifford Tagaban inherited twenty-five shares from his grandmother. He was also ineligible to participate in the plan.

In 1992 the plaintiffs amended their complaint, asserting class action claims. Kake moved for summary judgment on statute of limitations grounds. Superior Court Judge Thomas M. Jahnke ruled that each payment to favored shareholders gave rise to a separate cause of action, subject to a separate limitations analysis; that the six-year statute expressed in AS 09.10.050 governed this case; that the statute barred claims accruing more than six years before the case was filed, that is claims accruing before August 31, 1984; and that claims held by minors were tolled pursuant to the tolling provisions of AS 09.10.140.

In the spring of 1993, the parties filed cross-motions for summary judgment on remaining liability issues. At roughly the same time, by stipulation, the plaintiffs filed a second amended complaint which they claim expanded the class to include all shareholders who had been discriminated against, whether or not they participated in the plan.

The case was set for trial on June 28, 1993. Just before trial, the trial judge, Walter L. Carpeneti, ruled in the plaintiffs' favor on the summary judgment motions, holding "as a matter of law payments both to beneficiaries of shareholders and to shareholders directly under the challenged plan are distributions under state law, that the payments violate the rule of uniformity and that the defendant is therefore liable to plaintiffs."

On June 25, 1993, plaintiffs filed a motion to amend the class certification order to include all shares against which the plan had discriminated, not just those whose owners had been termed ineligible to participate in the plan. On the third day of trial Judge Carpeneti ruled on this motion, indicating that he would grant it, but only on the condition that the summary judgment order on liability be vacated, and that plaintiffs pay defendant's attorney fees for lost trial and trial preparation time.

The plaintiffs declined to accept these conditions and trial proceeded on the issue of damages. Following trial, the plaintiffs moved for reconsideration of the class certification order. The court again indicated that it would expand the class, but only on the condition that its order granting partial summary judgment on liability be set aside. A new trial would then be necessary. The class declined this condition and withdrew the motion for reconsideration.

Following the trial, the court found that any shareholders who had participated in the plan, no matter how briefly, were excluded from any remedy. The court ruled that the remedy of shareholders holding less than one hundred shares would be calculated on a per share basis, while the remedy of shareholders who held more than one hundred shares would be limited to one hundred shares. It found the plan to have cost Kake $1,996,000 or $47.30 for each participating share. The court awarded damages of $47.30 per share to the 11,152 shares which qualified for the remedy. Judgment for the class in the principal amount of $527,489.60 was entered. Subsequently, Judge Jahnke awarded prejudgment interest of $438,178.38 and attorneys' fees of $125,000.

Plaintiffs and Kake have appealed. Their claims on appeal will be identified in the discussion that follows.

## II. *DISCUSSION*

### A. *Payments under the Plan Were Illegal*

■ Kake claims that payments under the plan were not dividends. Instead, it argues that the plan was a social welfare program which is permissible under ANCSA. Kake, however, points to no provision which may be read as authorizing the plan.

It is true that a corporation may engage in charitable giving. AS 10.06.010(13) (a corporation has the power to "donate for the public welfare or charitable, scientific or educational purposes ... "). The plan, however, was merely a method of distributing corporate assets to certain shareholders. No reasonable argument can be made that the plan was instead a series of charitable gifts. Indeed, the stated purpose of the plan was to provide financial security to the original shareholders of Kake. Distributions were to be made regardless of the need or financial status of the distributees.

■ Kake also argues that the senior program was authorized under amendments to ANCSA passed in 1988. These amendments did authorize the issuance, without consideration, of a special class of stock for shareholders who had attained the age of sixty-

five. 43 U.S.C.A. § 1606(g)(2) (West Supp. 1996). However, creation of such stock requires a shareholder vote or an amendment to the articles of incorporation. 43 U.S.C.A. § 1629(b) (West Supp.1996). Kake never took these steps. Thus the senior program cannot be considered a valid exercise of the power granted by the 1988 ANCSA amendments.

■ Because no provision of ANCSA authorizes the plan, the payments in this case were illegal. Subject to certain limited exceptions not relevant for present purposes, holders of village corporation stock have "all rights of a stockholder in a business corporation organized under the laws of the State." The quoted language is drawn from section 7(h) of ANCSA (43 U.S.C.A. § 1606(h)(*l*) (West Supp.1996)), which pertains to the stock of regional corporations. Section 8 of ANCSA (43 U.S.C.A. § 1607) makes section 7(h) applicable to village corporations. One of the rights of a shareholder of a business corporation is the right to enjoy equal rights, preferences, and privileges on his or her shares. Alaska Statute 10.06.305 provides that "[a]ll shares of a class shall have the same voting, conversion, and redemption rights and other rights, preferences, privileges, and restrictions." The statute thus commands that every share shall have the right to "the same rights, preferences, and privileges" *of whatever sort.* Whether or not the payments at issue were "dividends" as the plaintiffs maintain, they unquestionably may be characterized as "preferences" or "privileges" based on stock ownership. It is evident, therefore, that the payments violated the rights of the excluded shareholders.

### B. *Statute of Limitations Issues*

### 1. *The Six–Year Statute Governs this Case*

■ Kake claims that this suit is an action "upon a liability created by statute" and is therefore governed by the two-year statute of limitations expressed in AS 09.10.070. Plaintiffs argue that the six-year statute set forth in AS 09.10.050 controls because this action is contractual in nature and is one that was recognized at common law.

■ We agree with the plaintiffs. The relationship between a corporation and its shareholders is primarily contractual. *See Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat) 518, 656, 4 L.Ed. 629, 664 (1819); *State ex rel. Swanson v. Perham,* 30 Wash.2d 368, 191 P.2d 689, 693 (1948). This court has previously held that actions against corporate directors for breach of fiduciary duty sound in contract and are governed by the six-year statute. *Bibo v. Jeffrey's Restaurant,* 770 P.2d 290, 295–96 (Alaska 1989). It is our view that the holding in *Bibo* applies by analogy to this case.

### 2. A Separate Cause of Action Accrued with Each Payment

■ Kake argues that the cause of action accrued on the effective date of the plan not, as Judge Jahnke ruled, that a separate cause of action accrued with each discriminatory payment. Citing *Howarth v. First National Bank of Anchorage,* 540 P.2d 486, 490–91 (Alaska 1975), Kake argues that it is not necessary for an injury to occur in order for a cause of action in contract to accrue. It contends that a cause of action accrues at the time when the plaintiffs could have first maintained the action to a successful conclusion. Plaintiffs, on the other hand, contend that each discriminatory distribution gave rise to a new cause of action because each payment was a new wrong. They rely on, among other cases, *Bibo,* 770 P.2d at 294.

One of the claims in *Bibo* was that controlling shareholders of a corporation made excessive compensation payments to a bookkeeping service in which the controlling shareholders had a majority interest. *Id.* at 292. Bibo, the minority shareholder, claimed that these excessive payments were, in essence, discriminatory dividends. *Id.* We held that a separate cause of action accrued with each payment to the bookkeeping service. "Each excessive payment is a separate wrongful act." *Id.* at 294.

■ It is our view that the *Bibo* precedent is applicable here. Acceptance of the rule

advocated by Kake would permit a corporation to escape liability for a plan to pay illegal distributions by announcing the program and then awaiting the expiration of the period of limitations before actually paying the distributions. We see nothing to commend such a result.[1]

### 3. Payments Made before August 31, 1984 Are Time Barred

■ In calculating damages, Judge Carpeneti did not distinguish between payments made more than six years before this suit was filed and payments made within the six-year period. Given our acceptance of Judge Jahnke's ruling that each discriminatory payment was a separate wrongful act, it follows that no compensation may be awarded for payments which were made more than six years before the suit was filed. While continuing payments prevent the running of the statute of limitations, there can be no redress for the time-barred payments. *See Oaksmith v. Brusich,* 774 P.2d 191, 200 n. 10 (Alaska 1989).

### 4. The Minor Tolling Statute Was Applied Properly

■ The trial court ruled that the statute of limitations for the claims of minor stockholders was tolled by AS 09.10.140. This statute provides in relevant part:

(a) If a person entitled to bring an action ... is at the time the cause of action accrues ... under the age of majority ... the time of ... disability ... is not a part of the time limit for the commencement of the action.... [T]he period within which the action may be brought is not extended in any case longer than two years after the disability ceases.

Stock of ANCSA village corporations "that a minor is entitled to receive ... shall be held by a custodian." AS 13.46.085(a). The custodianship is governed by the provisions of the Alaska Uniform Transfers to Minors Act, AS 13.46. *See* AS 13.46.085(d). Judge Jahnke ruled that the minor tolling statute

---

1. Kake also argues that plaintiffs' claims are barred by laches. Since, as indicated below, we hold that this is a direct action to recover damages for discriminatory distributions, the action

is one "at law" and the doctrine of laches is therefore inapplicable. *See Carter v. Hoblit,* 755 P.2d 1084, 1088 (Alaska 1988); *Gudenau v. Bang,* 781 P.2d 1357, 1363 n. 9 (Alaska 1989).

applies, even though shares of stocks are controlled by a custodian because legal title to the shares is held by the minor rather than the custodian.

Kake takes no issue with Judge Jahnke's conclusion that legal title to ANCSA stock held for a minor is in the minor rather than in the custodian. Kake argues, however, that since a custodian has the power to sue and a minor does not, AS 09.10.140 does not apply. Kake argues:

> [Alaska Statute] 09.10.140 tolls the statute of limitations "if a person who is entitled to bring an action ... is, at the time the cause of action accrues ... under the age of majority." In this case the person who is entitled to bring the action at the time it arose is the custodian, who is not under the age of majority. Consequently, AS 09.10.140 does not, by its terms, toll the statute of limitations for stock held by custodians.

Kake also argues that the policy reasons underlying statutes of limitations, the encouragement of prompt prosecution of claims and avoiding injustices which may result as a consequence of delay, favor not applying the tolling statute where there is a competent custodian.

Kake's argument focusing on the text of AS 09.10.140(a) lacks merit in our view. The "person" referred to in subsection (a) is the minor or other person under disability. The concept of entitlement to bring an action is most sensibly construed to mean entitlement, but for the person's disability. So understood, the act applies to minors, even those with guardians. While it is true that a custodian may sue on behalf of a minor, who is in turn not legally able to sue, a similar state of affairs exists for injured minor children.

Their parents may sue for them, and they are legally disabled from suing on their own behalf.[2] Yet, in such cases, the tolling rule plainly applies. *E.g., Fields v. Fairbanks North Star Borough,* 818 P.2d 658 (Alaska 1991).

There is weight to Kake's policy argument. However, there are countervailing policy considerations. Custodians are ordinarily not professional representatives and they may not be alert to the need to take action on a minor's behalf. It can be regarded as fundamentally unfair to a minor to saddle the minor with the consequences of a custodian's neglect. We stated in *Haakanson v. Wakefield Seafoods, Inc.,* 600 P.2d 1087, 1090–91 (Alaska 1979):

> The legislature has found [by enacting AS 09.10.140] ... that certain circumstances outweigh the policies underlying these statutes of limitation....
>
> This statute expresses the public policy that favors safeguarding the interests of minors....
>
> We can think of no good reason why this expression of legislative policy should not apply to wrongful death actions.

As in *Haakanson,* we can think of no persuasive reason why the minor tolling rule should not apply to cases involving a minor's property which is controlled by a custodian.[3]

### C. The Superior Court Was Correct to Permit the Plaintiffs to Proceed with a Direct Action

1. *Permitting a Direct Action in this Case Is the Only Way to Provide an Adequate Remedy for the Share holders Who Were Excluded from the Financial Security Plan*

 If a direct action were not permitted in this case, the possible defendants in a

---

**2.** AS 09.15.010 provides: "A parent may maintain an action as plaintiff for the injury or death of a child below the age of majority. A guardian may maintain an action as plaintiff for the injury or death of a ward." "The general rule is that an infant cannot personally bring an action on his behalf ... but must be represented ... by some legally authorized person." 42 Am.Jur.2d *Infants* §§ 155, 158 (1969).

**3.** The trial court's rationale is in accord with the rule embraced by most jurisdictions. *See* 51 Am.Jur.2d *Limitation of Action* § 183 (1970):

> In most jurisdictions, however, it is the rule that where the legal title or right of action is in the infant, the statute of limitations does not run against him during his minority, and the suit may be instituted by him within the statutory period after he has reached majority, even though a general guardian was appointed, and even though there existed other persons of legal age who were capable of suing.

derivative action would be (1) the shareholders who received payments under the financial security plan, and (2) the corporation's officers and directors. For the following reasons, it is unlikely that a derivative suit against either or both of these groups would be an adequate remedy for the plaintiffs.

First, the corporation may not be entitled to any damages from the shareholders who received payments under the financial security plan. Under AS 10.06.378, liability is imposed on shareholders who receive unlawful dividends *only* when they have accepted payments knowing that the distribution was in violation of certain legal limits. It is unlikely that the beneficiaries of the financial security plan knew that the payments violated the law. This suggests that the beneficiaries of the financial security plan would not be liable to the corporation.

Second, it is unlikely that any damages collected from the responsible directors and officers would approximate the sum of payments made under the plan.[4]

### 2. Courts Have Wide Discretion to Determine Whether a Complaint States a Derivative or a Primary Claim

Courts generally "have wide discretion in interpreting whether a complaint states a derivative or primary claim." Charles R.P. Keating & Jim Perkowitz–Solheim, 12B *Fletcher Cyclopedia of the Law of Private Corporations* § 5911 (perm. ed. rev.vol. 1993) (hereinafter *Fletcher*). Indeed, as the United States Supreme Court has recognized, the same allegations of fact in a complaint may support either a derivative or an individual cause of action. *See J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (stating with regard to claim that proxy was false and misleading, "we believe that a right of action exists as to both derivative and direct causes.").

It is possible to characterize the allegations in this case as stating a derivative claim. Courts have held that "when a wrong has been done to the corporation, the share-holder's right to sue the directors or wrong-doers for redress is derivative and not primary." 13 *Fletcher, supra,* § 5928. And, in a metaphysical sense, the illegal payments in this case can be said to have "harmed the corporation."

There is also ample support for the proposition that these allegations state a direct claim against the corporation. Two points supporting this contention warrant emphasis. First:

> A plaintiff alleges a special injury and may maintain an individual action if the shareholder complains of an injury distinct from that suffered by other shareholders, or a wrong involving one of the shareholder's contractual rights as a shareholder. Thus, where there is no question that plaintiffs are claiming an injury that was not suffered by all shareholders, but only by minority shareholders, that action is properly classified as representative rather than derivative.

13 *Fletcher, supra,* § 5908. In this case, the plaintiffs do not allege that the corporation was harmed. Their claim is that the corporation by paying certain shareholders a discriminatory distribution *harmed them.* Another way of expressing this point is that the rule "that a shareholder cannot sue for injuries to his corporation ... [does not apply when] the shareholder suffered an injury separate and distinct from that suffered by other shareholders." 13 *Fletcher, supra,* § 5911. In this case, the excluded shareholders clearly "suffered an injury separate and distinct from other shareholders." The shareholders who received payments under the plan suffered no meaningful injury whatsoever.

Although it seems anomalous to say that a shareholder who has received illegal payments has suffered an injury, it is true that there are cases in which courts have required a derivative suit where fiduciaries of a corporation who were also shareholders received illegal payments.[5] Such courts have

---

4. Additionally, even if the corporation actually did recover damages equivalent to the total payments under the financial security plan, any part of the damages paid by the directors and officers would be a windfall for the shareholders who received distributions under the plan.

5. *See Jones v. H.F. Ahmanson & Co.*, 1 Cal.3d 93, 81 Cal.Rptr. 592, 598–99, 460 P.2d 464, 470–71

reasoned that all the shareholders of the corporation—even the fiduciaries who received illegal payments—were harmed by the diminution in value of their shares and that the "corporation" therefore was injured. A holding permitting the plaintiffs here to proceed through a direct action would not be inconsistent with these cases: In all such decisions of which we are aware, the defendant shareholders were also fiduciaries of the corporation. This difference is significant because, as already suggested, a corporation can recover from fiduciaries who misappropriate corporate assets. It may not be able to recover from rank and file shareholders. Consequently, where the recipients of the misappropriated funds are fiduciaries, a derivative action will adequately compensate the plaintiffs; where the recipients of misappropriated funds are rank and file shareholders, a derivative action will not adequately compensate the plaintiffs.

The second point supporting the contention that a direct action is appropriate here is that there are many reported cases concerning discriminatory distributions which proceeded as direct actions. *See, e.g., Amalgamated Sugar Co. v. NL Industries, Inc.,* 644 F.Supp. 1229 (S.D.N.Y.1986); *Asarco, Inc. v. Holmes A. Court,* 611 F.Supp. 468 (D.N.J.1985); *Jones v. H.F. Ahmanson & Co.,* 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464 (1969); *Donahue v. Rodd Electrotype Co.,* 367 Mass. 578, 328 N.E.2d 505 (1975); *Erdman v. Yolles,* 62 Mich.App. 594, 233 N.W.2d 667 (1975); *Stoddard v. Shetucket Foundry Co.,* 34 Conn. 542 (1868). Although such cases usually involve close corporations, our research has not revealed a single case in

which (1) a publicly-held corporation made a discriminatory distribution to a group of its rank and file shareholders, (2) the shareholders attempted to proceed through a direct action, and (3) the court held that the plaintiffs had to proceed through a derivative action.

Thus, on the facts at issue here, a court has sufficient discretion to permit this action to proceed as either a direct or a derivative suit. The crucial inquiry, therefore, is how the court should exercise its discretion.[6]

3. *Although Its Decision to Permit the Plaintiffs to Proceed with a Direct Action Was Appropriate, the Superior Court Did Not Adequately Address Two Policy Concerns Raised by Its Order*

■ The superior court's decision (1) permitting the plaintiffs to proceed with a direct action, and (2) ordering Kake to pay damages immediately and in a single payment to the excluded shareholders, raises two policy concerns which the superior court did not adequately address. First, it is possible that an immediate lump sum payment to the excluded shareholders would be inconsistent with AS 10.06.358. That statute places certain limitations on the ability of a corporation to pay dividends. Second, it is conceivable that requiring Kake to pay damages immediately and in a lump sum would disrupt Kake's operations or prevent Kake from pursuing a profitable business opportunity. The result would be that all Kake shareholders would be injured.

Although these concerns should be addressed by the superior court on remand, neither of the concerns warrants a conclusion

(1969) ("In *Shaw v. Empire Savings & Loan Assn.* [186 Cal.App.2d 401, 9 Cal.Rptr. 204] ... the court noted the 'well established general rule that a stockholder of a corporation has no personal or individual right of action against third persons'.... From this the court reasoned that a minority shareholder could not maintain an individual action unless he could demonstrate the injury to him was somehow different from that suffered by other *minority* shareholders.... In so concluding the court erred. The individual wrong necessary to support a suit by a shareholder need not be unique to that plaintiff.") (citations omitted).

**6.** *See* Comment, *Distinguishing Between Direct and Derivative Shareholder Suits,* 110 U.Pa.L.Rev.

1147, 1157 (1962) ("Distinguishing between direct and derivative shareholder suits is not made easier by application of such question-begging phrases as 'personal right' and 'corporate cause of action.' Proper characterization can only be effected by considering the possible results of each suit: an individual recovery may leave corporate creditors with unsatisfied claims or deprive shareholders of part of their investment; a derivative suit may be barred by res judicata, may be prohibitive by reason of a security for expenses statute, or may inadequately compensate shareholders for peculiar individual injuries.").

that the superior court erred in permitting a direct action. As discussed above, where discriminatory payments are made to a group of rank and file shareholders, barring the excluded shareholders from proceeding through a direct action likely forecloses their only effective remedy. Under these circumstances, relegating the plaintiffs to a derivative suit seems unjustifiable if the two policy concerns can be adequately addressed in the context of a direct action.

They can be. On remand, the superior court should determine whether an immediate lump sum payment of the damages it orders will deplete Kake's assets below the level which would be permissible under AS 10.06.358. If a lump sum payment would have such an effect, the superior court should fashion a payment schedule which ensures that Kake's assets will not be depleted below the level permissible under AS 10.06.358. The superior court should also give Kake the opportunity to make a showing that its operations or investment opportunities would be impaired if it were compelled to pay immediately the entire amount of the judgment. If Kake can make such a showing, the superior court should fashion an appropriate payment schedule.

Finally, if the superior court concludes that an immediate lump sum payment of damages would be inappropriate for either of the reasons discussed above, the court should consider ordering Kake to suspend the payment of dividends to shareholders until Kake fully compensates the shareholders in the plaintiff class.

D. *Measure of Damages*

■ The trial court ruled that damages were to be determined by dividing the cost of the plan by the number of shares that were included in the plan, to arrive at the cost of the plan per share, then multiplying that cost by the number of shares held by the plaintiffs who were excluded from the plan. The court found that 42,200 shares participated in the plan, and the plan cost the corporation a total of $1,996,000. This resulted in a cost per share of $47.30. The trial court awarded each member of the plaintiff class $47.30 times the number of shares each held.

This approach is inconsistent with the nature of this case. If this were a derivative action, the remedy would be based upon the harm done to the corporation. However, this is a direct action to recover damages for a discriminatory distribution and the measure of damages suffered by plaintiffs should be a payment that gives them parity with those who received payments under the plan. *See Nichols v. Olympia Veneer Co.,* 139 Wash. 305, 246 P. 941 (1926).

Plaintiffs suggest, perhaps rhetorically, that a damage award could be made that would give plaintiffs parity with the highest distribution that any share received. This would amount to $542.16 per share. Plaintiffs arrive at the $542 figure by dividing the premiums that Kake paid for the shareholders with the most expensive policies, by the one hundred shares owned by those shareholders. This suggestion is faulty for two reasons. First, no shareholder actually received $542 per share. Second, the appropriate measure of damages is not the cost to the corporation, but the benefit to the shareholders. Although the premiums for the life insurance policies for several of the shareholders were in excess of $500 per share, these shareholders did not actually receive the policies, nor were their beneficiaries slated to receive the benefits defined in the policies. The policies were the method chosen by Kake to fund the payments promised under the plan. Kake retained control of the policies, retained the cash surrender value, and was the named beneficiary. Benefits paid upon the death of a shareholder were pooled into a managed account, controlled by Kake, and it was from this account that payments were made to the beneficiaries. No shareholder can actually be said to have received a life insurance policy under the program. The fact that some policies were very expensive while others were relatively cheap is irrelevant to plaintiffs' remedy.

Plaintiffs argue, apart from the suggestion discussed above, that benefits of $121 per share were paid to a significant number of Kake shareholders and that plaintiffs' damages should be calculated based on that benefit level. The $121 per share figure is based on the amount paid the elders. They re-

ceived twenty-three monthly payments of $100 before 1982. They did not receive any payments for the next seven years, but were then given a lump sum of $9,800, or $98 per share.

We agree that the payments to the elders furnish an appropriate measure for the compensatory distribution due plaintiffs. However, because the twenty-three monthly payments were all made more than six years before plaintiffs filed this suit, recovery for discrimination based on these payments is barred by the statute of limitations, except for shares held by minors. The $9,800 payments were made within the year before the suit was filed. Therefore adult plaintiffs are entitled to $98 per share, and minor plaintiffs are entitled to $121 per share.

### E. *The Trial Court Did Not Abuse Its Discretion in Denying the Motion to Expand the Class*

■ On March 10, 1993, the trial court certified the class consisting of "all those shareholders of Kake Tribal Corporation (1) who are not presently enrolled in the Kake Financial Security Plan, or (2) who have not been enrolled in the Plan at any time since 15 October 1980, or (3) who own [Kake] stock other than shares designated as '100 shares of original Class A Stock.'" In April 1993, the plaintiffs filed a second amended complaint which, they claim, expanded the class. As previously stated, *supra* p. 1323, immediately before trial plaintiffs filed a motion to amend the class certification order to "redefine the Class to include additional [Kake] shareholders who have been excluded from full participation in [Kake's] corporate distri-

butions." Judge Carpeneti indicated that he would grant the motion to expand the class, but only on conditions that plaintiffs would not accept. Plaintiffs' post-trial motion for reconsideration had a similar ultimate result. Plaintiffs argue that the trial court should have unconditionally granted the motion to expand the plaintiff class.

The trial court acted within its discretion in conditioning expansion of the class in the manner that it did. The class proposed by plaintiffs would have broadened the scope of the lawsuit. Plaintiffs' proposal would have inflated the class from only those shareholders who had never participated in the program to all shareholders except those who had received the maximum amount of benefits under the plan. As a practical matter, this would have included every shareholder who was not enrolled in the senior program.[7]

New defenses on liability applicable to the new class members were a possibility. The damages trial would be more complicated. Delay so that the notice and exclusion procedures mandated by Civil Rule 23(c) could be followed was inevitable. Trial time and trial preparation time would be lost. Under these circumstances the court could have simply denied the motion on untimeliness grounds. Conditioning the grant of the motion on reopening liability issues and paying costs for wasted time was also an appropriate resolution.[8]

### F. *Prejudgment Interest Must Be Recalculated*

Kake argues that prejudgment interest should not reach back beyond the bar im-

---

7. The court found that the equities as to such shareholders were less strong than those pertaining to class members:

> The court finds that shareholders who were never enrolled were *not* informed of their right to enroll.[5]
> 5. The court makes a contrary finding as to enrollees in the old plan who failed to enroll in the new plan. As to these shareholders, the evidence is clear that they were aware of the existence of the plan generally because they were enrolled in it and that they had specific notice of the new plan, given the substantial efforts of the corporation to notify old plan members of the need to re-enroll.
> . . . .

11. The court concludes that persons who were enrolled in the old plan but who failed to enroll in the new plan are not entitled to membership in the class. As to these persons only, the court has found that they were notified of the existence of the old plan, because they applied and were enrolled, and the court found that they were notified of the existence of the new plan, given the substantial efforts to notify old plan members of the need to re-enroll. . . . Under these circumstances, it would be inequitable to calculate damages as if these shareholders were *treated unfairly by their corporation.*

8. The same reasoning applies to the denial of plaintiffs' motion for reconsideration.

posed by the six-year statute of limitations. No effective response is made to this argument, and it is manifestly correct. The argument does not, however, apply to shares held by minors whose remedy is not barred by the six-year statute because of the minor tolling provision of AS 09.10.140.

■ Kake also argues that AS 09.30.070(b) governs a portion of this case. That section provides in relevant part:

[P]rejudgment interest accrues from the day process is served on the defendant or the day defendant received written notification that an injury has occurred and that a claim may be brought against the defendant for that injury, whichever is earlier.

This provision is applicable to causes of action which accrue after June 11, 1986. It therefore does not apply to payments made before that date.

Kake acknowledges that it received written notice from Mrs. Hanson of her claim and that of her son prior to June 11, 1986, but argues that it did not receive notice of a class claim until the amended complaint was filed on June 15, 1992. Therefore one issue is whether notice of an individual claim under subsection .070(b) will suffice to support the accrual of prejudgment interest on a class claim.

Plaintiffs argue that subsection .070(b) does not apply to contract claims, as it was adopted as part of tort reform legislation and uses the language of tort ("injury") rather than contract.

■ The briefing on these questions is inadequate. Ordinarily, in such circumstances the proponent of the issue is deemed to have waived the issue. *Adamson v. University of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991) ("[W]here a point is given only cursory statement in the argument portion of a brief, the point will not be considered on appeal."). However, in this case we do not believe that the waiver remedy would be appropriate because both parties are proponents of inadequately briefed points going to the award of prejudgment interest. Addi-

tionally, prejudgment interest must be entirely recalculated given our decision on the other issues in this case. Under these circumstances, we believe that it is best that the question of the application of AS 09.30.070(b) be reconsidered by the trial court on remand.

### G. *Attorney's Fees*

■ Plaintiffs argue that the trial court's award of attorney's fees under Civil Rule 82 was inadequate. As noted, the court awarded attorney's fees of $125,000 to be paid by Kake to the class.[9] In making the award the court did not follow the schedule set forth in Civil Rule 82(b)(1). It found that a variation was warranted because "Kake Tribal conducted a well-financed, deliberately excessively litigious defense." On the other hand, the trial court found that plaintiffs' counsel were inefficient and that the total amount of attorney's fees reasonably incurred by them had they worked efficiently would have been $210,000. The court awarded more than half of this sum as a partial award of attorney's fees in consideration of the factors listed in Civil Rule 82(b)(3).

Based on our review of the record we think that the superior court's conclusion concerning the inefficiency of plaintiffs' counsel is a reasonable one. Based on that conclusion and given the fact that the court's award of attorney's fees was greater than the amount that the class would have been entitled to under the schedule of Civil Rule 82(b)(1), we conclude that the award was not erroneous. On the other hand, on remand, it may be appropriate for the court to reconsider the award in light of the new judgment amount. The court is authorized to do so.

### III. *CONCLUSION*

The judgment of the trial court concerning liability is affirmed. The award of damages and prejudgment interest is vacated. The award of attorney's fees is affirmed, but the court may reconsider the award after damages are recalculated. This case is remand-

---

9. This award was made under the fee shifting provisions of Civil Rule 82. The court did not purport to be determining the amount of attor-
ney's fees which class counsel could charge the class. *See Municipality of Anchorage v. Gentile*, 922 P.2d 248 (Alaska 1996).

ed for further proceedings in accordance with this opinion.

AFFIRMED in part, VACATED in part, and REMANDED.

COMPTON, C.J., not participating.

FABE, Justice, dissenting.

I. *INTRODUCTION*

I dissent from the opinion of the court because I disagree with its decision to allow plaintiffs to bring a direct rather than a derivative action. The gravamen of the plaintiffs' complaint is a wrong to the corporation as a whole. Basic principles of corporation law therefore require the plaintiffs to bring a derivative shareholder action to remedy that wrong. The court's failure to adhere to this well-established rule leads it to adopt a result that rather than remedying the discriminatory plan, continues it. Under the court's decision, shareholders who are as innocent of wrongdoing as the plaintiffs will be forced to pay for a recovery that bears little relationship to any harm the plaintiffs actually suffered.

II. *DISCUSSION*

A. *As a Native Corporation, Kake Differs Significantly from Non–Native Corporations in Purpose and History.*

The facts of this case cannot be properly understood without a brief discussion of the history and aims of the Alaska Native Claims Settlement Act (ANCSA). Although Kake's "financial security plan" was not permissible under ANCSA, the distributions under the plan did not arise from greed or bad faith. Rather, they resulted from the conflicts inherent in the difficult role ANCSA gave to Native corporations.

In enacting ANCSA, Congress intended to settle Native land claims in a way that both initiated Natives into the "American mainstream," Monroe E. Price, *A Moment in History: The Alaska Native Claims Settlement Act,* 8 UCLA–Alaska L.Rev. 89, 95

(1979), and addressed their "real economic and social needs." 43 U.S.C. § 1601(b) (1994). Under ANCSA, Congress imposed on the myriad Alaska Native communities a "formidable framework" of corporations to distribute settlement land and funds and serve as a vehicle for Native development. *Felix S. Cohen's Handbook of Federal Indian Law* 752–53 (Rennard Strickland et al. eds., 1982) (hereinafter *Cohen* ). These corporations, as the Ninth Circuit recently noted, "differ markedly from ordinary business corporations" in their structure and purposes. *State v. Native Village of Venetie Tribal Gov't,* 101 F.3d 1286, 1295 (9th Cir. 1996). John Shively, an expert witness for Kake in the instant case, testified that ANCSA's use of the corporate model should be understood as a "social experiment," unprecedented in Congress's dealings with Native Americans elsewhere. *See Cohen, supra,* at 740.

In 1987, Congress amended ANCSA to reconcile the corporate form and the needs of Native communities. *Alaska Native Claims Settlement Act Amendments of 1987,* S.Rep. No. 100–201, 100th Cong., 1st Sess. 19–21 (1987), *reprinted in* 1987 U.S.C.C.A.N. 3269–72 (hereinafter S. Rep. 100–201). Under these amendments, Native corporations are allowed to convey assets to a "settlement trust" to "promote the health, education, and welfare of its beneficiaries and preserve the heritage and culture of Natives." 43 U.S.C. § 1629e(b)(1) (1994).[1] The amendments also allow regional corporations to issue different classes of stock so as to benefit "Natives who have attained the age of sixty-five" and "other identifiable groups of Natives." 43 U.S.C. § 1606(g)(2)(B)(iii)(I) and (II) (1994). The result, as John Shively testified, has been to "recognize the nativeness of the settlement, not the corporateness of the settlement" and to "provide for what the [N]atives felt met their ... real economic and social needs." *See* S. Rep. 100–201, *supra* p. 29, at 20–21,

---

1. The Ninth Circuit recently upheld such a settlement trust established by Sealaska Corporation to make a one time payment of $2,000 to each shareholder who reaches 65 years of age. *Broad v. Sealaska Corp.,* 85 F.3d 422, 425 (9th Cir.

1996). In so holding, the court determined that ANCSA preempted state law with respect to the establishment of trusts and the distribution of trust assets. *Id.* at 426.

U.S.Code Cong. & Admin.News 1987, pp. 3270–72.

It is against this backdrop that Kake's financial security plan must be understood. The plan began as a means to assist shareholders in the village corporation who had seen little direct compensation from the ANCSA settlement.[2] Rather than "merely a method of distributing corporate assets to certain shareholders," Op. at 1324, the plan was an attempt to overcome the " 'limitations of the corporate form of organization as the means of delivering benefits.' " Martha Hirschfield, Note, *The Alaska Native Claims Settlement Act: Tribal Sovereignty and the Corporate Form*, 101 Yale L.J. 1331, 1338 (quoting U.S. Dep't of the Interior, ANCSA 1985 Study, at ES–14 (June 29, 1984) (unpublished draft)).

Kake chose the structure of the plan at the suggestion of Mutual Life Insurance Company of New York (MONY), which then sold Kake the insurance to fund it. MONY assured Kake's president that the plan would "fit into the provision [sic] of the Alaska Native Claim [sic] Act" and "protect both Kake Tribal Corporation and Mutual of New York from not only dissatisfied [sic] shareholder [sic], but eager attornies [sic] and the Internal Revenue Service as well."

The board of directors adopted the plan and publicized it "for the welfare of our people who were retired or for the welfare of those whom they left behind when they died." Clarence Jackson, the president of Kake and a member of the board of directors when the plan was adopted, stated that the board "feared that ANCSA meant that various welfare programs of the United States for Alaska Natives might be phased out leaving it to the corporations to provide for the security of these people." Along with the benefits described by the court, Op. at 1322–1323, the corporation also paid the funeral expenses for all deceased shareholders, whether or not they were plan members. The plan, while untenable for a traditional

business corporation, was in line with ANCSA's purposes and similar to the programs approved by Congress in the 1988 amendments to ANCSA and recently upheld by the Ninth Circuit. *See* 43 U.S.C. § 1606(g)(2)(B)(iii)(I); *Broad v. Sealaska Corp.*, 85 F.3d 422 (9th Cir.1996).

However, while the context of this case is unusual, I agree with the court that the financial security plan was not permitted under ANCSA or Alaska law. Kake never undertook any of the procedural steps to establish a settlement trust under 43 U.S.C. § 1629e (1994). Therefore, Kake's financial security plan cannot be approved under the 1988 amendments to ANCSA. The question remains, however, what legal consequences should flow from that conclusion.

B. *The Superior Court Should Have Required Plaintiffs to Frame Their Complaint as a Derivative Shareholders' Action, Not a Direct Action.*

Under basic principles of corporation law, when the board of directors and executives of a corporation make an impermissible payment of corporate funds, the shareholders' right to redress is derivative and not direct. Charles R.P. Keating & Jim Perkowitz–Solheim, 12B *Fletcher Cyclopedia of the Law of Private Corporations* §§ 5928, 5929.20 (perm. ed. rev.vol. 1993) (hereinafter *Fletcher*). This is the rule even if the illegal payments are made to other shareholders. *See, e.g., Mann–Paller Found. v. Econometric Research*, 644 F.Supp. 92, 93–94, 98 (D.D.C.1986). The reasoning behind this rule is that such impermissible payments, by reducing the corporation's assets and thus the value of each share of stock, harm all shareholders equally. *Id.* at 98; *see also* 12B *Fletcher, supra* p. 5, § 5913. Thus, for the shareholders to be made "whole," the misspent assets must be recovered by the corporation so that they can be used for proper corporate purposes. *Hikita v. Nichiro Gyo-*

---

**2.** ANCSA settlement funds were distributed differently to Natives who own shares in both a village and a regional corporation than they were to those who only own shares in a regional corporation. *See* 43 U.S.C. § 1606(i), (j), (m) (1994). While those who only owned shares in

regional corporations received direct distribution of settlement funds and revenues from the sale of timber and subsurface resources, those who owned shares in village corporations did not; their portion was distributed instead to the village corporation. *Id.*

*gyo Kaisha, Ltd.,* 713 P.2d 1197, 1199 (Alaska 1986).

The court acknowledges the merit of this analysis, Op. at 1327, but avoids its application. Instead, relying on its conviction that the harm to the plaintiffs consisted in Kake's failure to make payments to them under the plan, the court concludes that Kake must pay the plaintiffs the same amount as it paid the elders. Op. at 1328, 1330. This reasoning can be summarized as follows: (1) the plaintiffs' only possibility for a recovery is through a direct action; (2) the trial court has broad discretion in allowing direct actions; (3) a direct action is justifiable in this case because the plaintiffs complain of a "special injury;" and (4) the trial court can modify the remedy to alleviate the problems created by permitting a direct action. I address each step of this argument in order.

The court's opinion states that "a direct action ... is the only way to provide an adequate remedy" to the plaintiffs. Op. at 1326–1327. It reasons first that "the corporation may not be entitled to any damages from the shareholders who received payments under the financial security plan." Op. at 1327. I agree. The court also states, however, that "it is unlikely that any damages collected from the responsible directors and officers will approximate the sum of payments made under the plan." Op. at 1327. There is no support for this assumption in the record before us. Furthermore, even if this assertion were supported by the record, I fail to see its legal relevance. The proper focus in determining whether a shareholder may bring a direct or a derivative action is not the likelihood of complete recovery, but the nature of the harm. 12B *Fletcher, supra* p. 5, § 5908.

The court further argues that "even if the corporation actually did recover damages equivalent to the total payments under the financial security plan, any part of the damages paid by the directors and officers would be a windfall for the shareholders who received distributions under the plan." Op. at 1327 n. 4. However, such a "windfall" would not harm the plaintiffs. The plaintiffs would receive no more and no less than what they were entitled to: the full value of their shares in the corporation. Any extra payment to shareholders who received distributions under the plan would be funded entirely by those found liable for the impermissible distributions, not by the plaintiffs or the corporation. Furthermore, the payments would not reward wrongdoing, since, as the court notes, the shareholders who were included in the plan most likely did not know "the payments violated the law." Op. at 1327.

As the next step in its analysis, the court states that the superior court has "wide discretion in interpreting whether a complaint states a derivative or primary claim." Op. at 1327. The full statement of the rule is as follows:

> [C]ourts generally have wide discretion in interpreting whether a complaint states a derivative or primary claim. The caption and prayer may aid in determining which is the true character of the action, although the complaint does not make an action individual or derivative by calling it one or the other, and the prayer for relief may be disregarded in determining whether the action is an individual or a derivative one. The nature of the action is to be determined from the body of the complaint rather than from its title.

12B *Fletcher, supra* p. 32, § 5912. This passage means that the trial court is free to disregard the parties' characterization of the cause of action, not that the law affords the trial court latitude in making its determination. This principle, in my view, is central to a correct understanding of this case. The superior court erred in this case because it failed to look beyond the plaintiffs' characterization of their claim.

There are cases, as the court's opinion points out, in which a shareholder may bring both a derivative and a direct action. *See, e.g., Hikita,* 713 P.2d at 1199. However, in such cases the shareholder must have an independent basis for the direct action, usually the corporation's violation of a duty "arising from contract or otherwise, and owed to the shareholder directly." 12B *Fletcher, supra* p. 32, § 5921. Such an independent

basis is not present in this case.[3]

In the third step of its analysis, the court contends that the plaintiffs may bring a direct action in this case because they suffered an injury "separate and distinct from other shareholders." Op. at 1327. As the majority goes on to point out, however, courts have not adopted this "special injury" exception in cases like this one where all the shareholders, even the ones who received the illegal payments, were harmed by the misspending of corporate assets and the corresponding diminution in the value of shares. Op. at 1328. This reasoning also applies here. All the shareholders of Kake were injured by the financial security plan, many of them to an extent almost as great as the plaintiffs.[4] The fact that ten of the 575 shareholders received, through no fault of their own, a payment of $9,800 should not be allowed to alter the analysis of this case. As the plaintiffs correctly state, most shareholders "received an inexpensive distribution, a cheap insurance policy costing only a fraction of what the Cadillac policies cost."

The court recognizes this crucial point when it states in the section of the opinion discussing its remedy: "[I]t is conceivable that requiring Kake to pay damages immediately and in a lump sum would disrupt Kake's operations or prevent Kake from pursuing a profitable business opportunity. The result would be that *all Kake shareholders would be injured.*" Op. at 1328 (emphasis supplied). In other words, the court acknowledges that even though plaintiffs will benefit by receiving a damage award, they will also be harmed by the impact of that award on the value of their shares. This statement applies equally to the payments made under the plan and stands in contradiction to the majority's statement that the "shareholders who received payments under the plan suffered no meaningful injury whatsoever." Op. at 1327.

As its "second point supporting the contention that a direct action is appropriate," the court asserts that "there are many reported cases concerning discriminatory distributions which proceeded as direct actions." Op. at 1328. The six cases cited to support this statement, however, are distinguishable. In the first two, *Amalgamated Sugar Co. v. NL Industries,* 644 F.Supp. 1229, 1234 (S.D.N.Y. 1986) and *Asarco, Inc. v. Holmes A. Court,* 611 F.Supp. 468, 479–80 (D.N.J.1985), the plaintiffs sought injunctions against *ultra vires* corporate acts. Such a direct action to enjoin the plan, rather than to recover monetary damages, would have been appropriate in this case.[5] *See* 12B *Fletcher, supra* p. 32, § 5915.10.

The rest of the cited cases deal with closely held corporations.[6] While some courts

---

**3.** The U.S. Supreme Court case cited by the court's opinion, *J.I. Case Co. v. Borak,* 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964), contradicts the proposition for which it is cited. The *Borak* Court held that a derivative action could be brought under the Securities Exchange Act of 1934 for the injury suffered due to a deceptive proxy solicitation. *Id.* at 431–32, 84 S.Ct. at 1559–60. In fact, *Borak* states that ordinarily a direct action will *not* be available to a shareholder as a remedy for the injury caused by deceptive proxy solicitations, since that injury "flows from the damage done the corporation." *Id.* at 432, 84 S.Ct. at 1560. Based on this reasoning, the Court concludes that "[t]o hold that derivative actions are not within the sweep of the section would therefore be tantamount to a denial of private relief." *Id.*

**4.** The court states that "the illegal payments in this case can be said to have 'harmed the corporation'" in "a metaphysical sense." Op. at 1327. As I see it, the plan's impact on the assets of the corporation and hence on the value of shares in the corporation is concrete and easily measured.

**5.** The court's decision has the consequence of rewarding plaintiffs, by allowing them to recover directly, for not asserting their rights earlier.

**6.** These cases are distinguishable in other key respects as well. In *Jones v. H.F. Ahmanson & Co.,* 1 Cal.3d 93, 81 Cal.Rptr. 592, 606, 460 P.2d 464, 478 (1969), the plaintiff sought a forced buyout of her shares, not a distribution. *Donahue v. Rodd Electrotype Co.,* 367 Mass. 578, 328 N.E.2d 505, 511 (1975), involved a minority shareholder's "equal opportunity to sell her shares to the corporation." The court ordered the corporation either to reverse the purchase of the controlling shareholder's stock or to purchase the minority shareholder's stock. *Id.* at 520–21. In *Erdman v. Yolles,* 62 Mich.App. 594, 233 N.W.2d 667, 669 (1975), the court found that the distribution at issue was a dividend. Such a finding, not warranted by the facts of this case, establishes a contractual right on the part of the individual shareholder to sue the corporation directly. *Id.; see also* 12B *Fletcher, supra* p. 32, § 5922. Similarly, the court in *Stoddard v. Shetucket Foundry Co.,* 34 Conn. 542 (1868), held

"recognize the right of a close corporation shareholder to sue directly ... on a cause of action which would normally have to be brought derivatively," 12B *Fletcher, supra* p. 32, § 5911.50, this court does not. *Arctic Contractors, Inc. v. State,* 573 P.2d 1385, 1386 n. 2 (Alaska 1978) (stating that the "rule against individual shareholder suits also applies where all the stock in the corporation is held by one person or by a small number of people"). Even if we did recognize this exception, however, Kake is not a close corporation. Furthermore, the policy reasons for treating close corporations differently than other corporations in regard to direct actions do not support allowing a direct action in this case.[7]

Finally, the court attempts to address the "policy concerns" raised by its decision by instructing the superior court to make two findings. Op. at 1329. Rather than alleviate those concerns, however, the findings required by the majority highlight them, demonstrating even more clearly why the plaintiffs should not have been allowed to bring a direct action in this case. This court stated in *Hikita,* 713 P.2d at 1199, that one reason direct actions are not permitted where the harm is to the corporation is to protect "the prerogative of the board of directors to determine how the recovered damages should be utilized." We have recognized that, because "[j]udges are not business experts, ... courts are reluctant to substitute their judgment for that of the board of directors." *Alaska Plastics, Inc. v. Coppock,* 621 P.2d 270, 278 (Alaska 1980). The majority opinion, however, orders the superior court to consider if Kake's "operations or investment opportunities would be impaired if it were compelled to pay immediately the entire amount of the judgment." Op. at 1329. This

represents exactly the type of intrusion courts have traditionally avoided.

The court's opinion also requires the superior court, if it "concludes that an immediate lump sum payment of damages would be inappropriate," to "consider ordering Kake to suspend the payment of dividends to shareholders until Kake fully compensates the shareholders in the plaintiff class." Op. at 1329. This suspension of dividends underlines that the majority of shareholders, whom the plaintiffs acknowledge suffered considerable discrimination under the plan, will fund the plaintiffs' recovery. Thus, for these shareholders, the majority's decision, rather than remedying the plan, continues it: Kake will now be forced to make more cash payments to yet another, larger group of select shareholders.

### III. *CONCLUSION*

Kake erred in adopting its financial security plan. This mistake injured not only the plaintiffs, but all of those who own shares in the corporation. These individuals, who became corporate shareholders by Congressional action rather than through individual investment decisions, have a tremendous stake in the success of their corporation. Allowing plaintiffs to recover directly from the corporation is not only unfair to the rest of the shareholders, it is inconsistent with the principles of corporation law. Ironically, this same body of law that has so often been a stumbling block for Native corporations should, in this case, have worked in Kake's favor. Therefore, I respectfully dissent.

---

that where a dividend had been paid to all of the stockholders except plaintiff, "the company could not set up as against [the plaintiff] that the dividend had not been earned." 11 Timothy P. Bjur & James Solheim, *Fletcher Cyclopedia of the Law of Private Corporations* § 5352 n. 2 (perm. ed. rev.vol. 1995)(citing *Stoddard,* 34 Conn. 542 (1868)).

7. Courts make the exception when the close corporation is similar to a partnership, when "there

are no persons not before the court who can be affected by the litigation," and when there is "no danger of a multiplicity of lawsuits." 12B *Fletcher, supra* p. 32, § 5911.50. None of these reasons applies to this case. Kake is not like a partnership, the majority of the shareholders affected by this litigation are not before the court, and there is a danger of a multiplicity of lawsuits.