Gertrude A. DEMMERT and Jessie N. Jim, for themselves and for all other who are similarly situated, Appellants,

v.

KOOTZNOOWOO, INC., Appellee.

No. S-9348.

Supreme Court of Alaska.

April 5, 2002.

Rehearing Denied May 13, 2002.

---

**25.** *A.H. v. State*, 10 P.3d at 1166.

Fred W. Triem, Petersburg; John W. Widell, Spencer Hall, Hall Zanzig Widell, Seattle; Douglas M. Branson, Pittsburg, for Appellants.

Clark Reed Nichols, Perkins Coie LLP, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

Gertrude Demmert and Jessie Jim appeal the superior court's denial of their claims that Kootznoowoo, Inc., distributed corporate wealth and benefits in a discriminatory manner, that the corporation attempted to conceal its discriminatory practices from its shareholders, and that director conflicts of interest invalidated certain corporate programs. Because the superior court made findings of fact supported by the evidence that resolve these issues in favor of Kootznoowoo, we affirm the superior court's denial of appellants' claims.

## II. FACTS AND PROCEEDINGS

Kootznoowoo is the Native village corporation for the village of Angoon. Its primary business is managing approximately 21,440 acres of timberlands selected pursuant to Section 506 of the Alaska National Interest Lands Conservation Act. Appellants are shareholders of the corporation.

One of Kootznoowoo's major activities respecting its lands is cutting timber. This activity presented a unique challenge, as the corporation was unable to select the lands surrounding Angoon for resource development. Kootznoowoo was forced to exchange its rights to land surrounding Angoon, on Admiralty Island, for lands on distant Prince of Wales Island. For some time, this meant that Kootznoowoo hired others to transport, process, and load its logs. Southeast Stevedoring Corporation provided the longshoring and stevedoring services necessary to load Kootznoowoo's logs.

In the summer of 1988 the management of Southeast Stevedoring approached Pat Joensuu of Kootznoowoo with a proposal for loading logs at a site in Dora Bay located near Kootznoowoo's timberlands. Southeast Stevedoring recognized that if Kootznoowoo could establish a mooring system and log loading facility near its timberlands, it could avoid the costs and risks involved in towing log rafts to remote locations. Eventually, the two parties agreed to establish such a log loading facility, with Kootznoowoo providing

the camp facilities and work force and Southeast Stevedoring providing management expertise and mooring buoys for the ships.

Kootznoowoo established a shareholder hiring preference for the longshoring work, and in order to gather the necessary labor force, the corporation helped to pay workers' transportation costs. While Kootznoowoo understood the payment of travel costs for laborers working at remote sites to be standard industry practice,[1] the corporation could not afford to pay the entirety of the costs. Thus, Kootznoowoo paid for about half of the longshore workers' transportation costs.[2] While the longshoring positions were open to all Kootznoowoo shareholders, Kootznoowoo would only pay travel costs for group trips originating in Angoon. The corporation believed that this ensured a more fully available, flexible, and coordinated crew of workers.

Meanwhile, Southeast Stevedoring managed the labor force, selected and trained workers for "skilled" positions, and negotiated with customers rates for loading logs "which recognized that transportation for longshore workers was a cost that should be passed through to the log owner."

Longshore workers could perform one of two types of work for the joint venture: skilled or unskilled. Southeast Stevedoring maintained an "active skilled working list" of people that would be dispatched to fill skilled positions in upcoming jobs. Southeast Stevedoring decided who to place on this list, who to dispatch for work, and who to consider for advancement. For unskilled positions, Kootznoowoo kept a rotation list of shareholders eighteen years or older who were capable of and willing to perform longshoring work. Southeast Stevedoring informed Kootznoowoo of the need for unskilled workers as it arose, and Kootznoowoo notified individuals whose names came up on the rotation list.

Appellants brought suit to challenge several aspects of Kootznoowoo's longshoring program, as well as the corporation's partial payment of longshore workers' travel costs. The superior court found for Kootznoowoo, upholding both its participation in the joint venture longshoring program and its practice of paying longshore workers' travel costs.

## III.  DISCUSSION

### A.  Neither Kootznoowoo's Distribution of Longshoring Employment Opportunities nor the Corporation's Payment of Longshore Workers' Travel Costs Constituted Discriminatory Distribution of Corporate Wealth or Dividends.

■ Appellants contest Kootznoowoo's distribution of longshoring opportunities as

---

**1.**  Prior to the formation of the Kootznoowoo–Southeast Stevedoring joint venture, several Kootznoowoo shareholders had worked as longshore workers for West Coast Stevedoring Company, and that company had paid the costs for transportation between Angoon and remote log loading ports, as well as room and board costs for the longshore workers.

**2.**  Kootznoowoo paid these costs regardless of whether the longshore workers hired were Kootznoowoo shareholders. The percentage of transportation costs paid by Kootznoowoo varied depending on changes in group flight prices. The longshore workers themselves paid a steady amount of $175 per trip. This amount originally constituted half of the cost per trip; however, as flight prices increased, the longshore workers' contributions covered a declining percentage of the transportation costs. Transactions were never directly between Kootznoowoo and its shareholders; rather, Kootznoowoo paid the transportation and lodging costs for the labor force, and Southeast Stevedoring withheld appropriate amounts from the longshore workers' paychecks to reimburse Kootznoowoo.

The amount that Kootznoowoo contributed for lodging was disputed at trial. Longshore workers had $15 per day withheld from their paychecks to reimburse Kootznoowoo for their meals and lodging. Kootznoowoo claims that this amount covered any lodging costs incurred; however, appellants argue that the $15 per day did not completely cover the cost of feeding and housing the longshore workers, and that Kootznoowoo was thus losing money on food and lodging, as well as on transportation. The superior court resolved this dispute, finding that "Kootznoowoo did not ultimately bear the costs for camp services for the longshore workers." The court noted that "[a]s the operating expenses for camp services increased, those increases were passed along to the longshore workers (e.g., increased to $16.50 per day)," and that "[t]he amount the longshore workers were charged for camp services was approximately a 'break even' rate."

well as its payment of "travel subsidies" for longshore workers. They argue that by paying for longshore workers' transportation and lodging, Kootznoowoo is distributing corporate wealth in a manner that discriminates among its shareholders. Appellants also argue that because the corporation only subsidizes travel to and from Angoon, it excludes shareholders outside of Angoon from its pool of qualified workers. They claim that the opportunity to work as a longshore worker and the payment of travel subsidies constitute a form of wealth "not available to the 63.1% of Kootznoowoo's shareholders who reside elsewhere." Thus Kootznoowoo's operation of its longshoring program treats corporate shares in a discriminatory manner, violating the corporation's contract with its shareholders, as well as the Equal Treatment Rule codified in AS 10.06.305, -.308, and -.313,[3] applicable to the Alaska Native Village Corporation through the Alaska Native Claims Settlement Act §§ 7(h)(1)(A) and 8(c).[4]

Kootznoowoo responds that its decision to enter into the joint venture with Southeast Stevedoring, its resulting employment of Kootznoowoo shareholders in longshoring positions, and its partial payment of those longshore workers' transportation costs[5] were all directed at maximizing the financial and employment opportunities of its general shareholder population. Because of the unique placement of its timberlands—remote from Kootznoowoo's headquarters in Angoon—the corporation faced a special challenge in finding a profitable way to process and load its logs. Kootznoowoo thus hoped to profit by processing its logs in a location convenient to its timberlands and by providing the labor for that work. As stated by the corporation's comptroller: "If you could provide for the profit motive and hire shareholders, why not? It was a ... good practice for the corporation."

While appellants contend that Kootznoowoo's payment of transportation costs caused the corporation losses and imply that this demonstrates an intent to merely distribute benefits to selected shareholders, Kootznoowoo argues that achieving a coordinated and productive labor force demanded that it pay some of the longshore workers' costs. Otherwise, many shareholders could not afford to travel to the remote Dora Bay site, and Kootznoowoo's plan to save money by utilizing its own worksite and labor force would fail. Kootznoowoo additionally asserts that it chose to pay transportation costs only to and from Angoon, because efficiency and maximum profit demanded that it have coordinated teams of workers ready to fly out together to work. Kootznoowoo thus maintains that its actions were in the best interests of all of its shareholders and that its contributions toward travel costs were not discriminatory dividends, but instead necessary and ordinary business expenses.[6]

The superior court's findings of fact support Kootznoowoo's claims. These findings confirmed the existence of the Kootznoowoo/Southeast Stevedoring joint venture and concluded that both parties "believed that

**3.** AS 10.06.305(b) provides that "[a]ll shares of a class shall have the same voting, conversion, and redemption rights and other rights, preferences, privileges, and restrictions...." AS 10.06.308 provides that "a corporation may issue preferred or special classes of shares" only "[i]f authorized by the articles of incorporation...." AS 10.06.313 states that "shares of the same class shall be identical...."

**4.** 43 U.S.C. §§ 1601–1641. ANCSA § 7(h)(1)(A), applied according to the provision of § 8(c), vests the shareholder of a Native village corporation with "all rights of a shareholder in a business corporation organized under the laws of the State."

**5.** *See supra* note 2. Kootznoowoo argues, and the superior court agreed, that the corporation did not internalize the longshore workers' lodging costs. While Kootznoowoo did initially pay for the lodging facility and food for longshore workers, Southeast Stevedoring withheld an amount from longshore workers' paychecks adequate to reimburse Kootznoowoo at "approximately a 'break even' rate."

**6.** This distinguishes Kootznoowoo's longshoring program from the financial security plan struck down in *Hanson v. Kake Tribal Corp.*, 939 P.2d 1320 (Alaska 1997). In *Hanson*, we held that the financial security plan "was merely a method of distributing corporate assets to certain shareholders.... Indeed, the stated purpose of the plan was to provide financial security to the original shareholders of Kake." *Id.* at 1324.

the ... joint venture could develop Dora Bay into a major log port/ship loading facility to handle not only Kootznoowoo's logs, but also logs for Sealaska Corporation, ITT–Rainier, Reid Brothers Timber, Klukwan Forest Products, Ketchikan Pulp Company, Cape Fox, etc." The superior court recognized that Pat Joensuu "projected Kootznoowoo's share of the potential log loading revenues at over $2 million." These findings are based on the testimony of several Kootznoowoo board members as well as internal memoranda and correspondence between members of the board and indicate the board's intent to benefit Kootznoowoo and its general population of shareholders.

Regarding Kootznoowoo's payment of travel costs for its labor force, the superior court found that "Kootznoowoo and Southeast Stevedoring considered transportation of longshore workers to and from the remote work site at Dora Bay to be an ordinary and necessary business expense," and that Southeast Stevedoring accounted for this expense by negotiating rates with the joint venture's outside customers "which recognized that transportation for longshore workers was a cost that should be passed through to the log owner." These findings are based in part on testimonial evidence. Both Gerald Engel (Kootznoowoo's Lands and Resources Manager) and James Taro (President of Southeast Stevedoring) testified that it was common practice for log owners or stevedoring companies to pay transportation costs for longshore workers. In fact, one of the joint venture's competitors, West Coast Stevedoring, paid the entirety of transportation and lodging costs when it had employed Kootznoowoo shareholders as longshore workers. Moreover, Kootznoowoo was able to deduct its transportation payments as a business expense on its federal income tax returns. In addition, the superior court points out that "[t]here was no transfer of corporate assets without consideration. Kootznoowoo received consideration for the expense of trans-

portation of longshorepersons between Angoon and Dora Bay in the form of work and increased profits."

Regarding Kootznoowoo's decision to only subsidize charter flights to and from Angoon, the court found credible the corporation's explanation that it was attempting to maximize efficiency and productivity by maintaining well-organized and prepared teams of workers. The court decided that "[h]iring from Angoon assured an available pool of full complement longshoring gangs to timely meet the needs of the ship loading joint venture."

On the whole, the superior court concluded that "Kootznoowoo's policy of paying a portion of the travel costs of shareholders between Angoon and Dora Bay was not adopted as a distribution to its shareholders, but as a program that would increase Kootznoowoo's profits and encourage shareholder employment." The court thus affirmed Kootznoowoo's motives and practices and rejected appellants' claims that the corporation was distributing corporate wealth and benefits in a discriminatory manner. The superior court based its finding upon a great deal of documentary and testimonial evidence. We do not think that its findings are clearly erroneous,[7] and thus we uphold its findings and resulting conclusions.

### B. Kootznoowoo Did Not Attempt to Hide or Fail to Provide Necessary Information to Its Shareholders.

■ Appellants also contend that Kootznoowoo failed to inform all of its shareholders of the longshoring employment opportunities and travel subsidies available. Kootznoowoo responds that it did indeed inform its shareholders of the longshoring and travel subsidy programs. The corporation claims to have posted longshoring lists and its Longshore Assignment Policy conspicuously around Angoon, as well as pub-

---

7. *See Henash v. Ipalook,* 985 P.2d 442, 445 (Alaska 1999); *Gallant v. Gallant,* 945 P.2d 795, 800 (Alaska 1997) (quoting *Martens v. Metzgar,* 591 P.2d 541, 544 (Alaska 1979)) ("Determination of net income is a question of fact and is reviewed under the clearly erroneous standard. A factual finding will be deemed clearly erroneous if the reviewing court is 'left with a definite and firm conviction on the entire record that a mistake has been made....' "). *See also Parker v. Northern Mixing Co.,* 756 P.2d 881, 887–88 (Alaska 1988); *State v. First Nat'l Bank of Ketchikan,* 629 P.2d 78, 82 n. 4 (Alaska 1981).

lishing general information about the longshoring program in corporation newsletters.

Once again, based upon documentary and testimonial evidence, the superior court's findings of fact support Kootznoowoo. The court found that "Kootznoowoo's Longshore Assignment Policy was conspicuously posted in Angoon and sent to all longshorepersons" and that "Kootznoowoo's management and its board of directors made no attempt to hide or conceal any aspect of Kootznoowoo's Longshore Assignment Policy, including what has been referred to as the 'travel subsidy.' " The court also noted in its findings that "[t]he large number of shareholders participating in the longshoring program (approximately 155) creates the very strong inference that important aspects of Kootznoowoo's Longshore Assignment Policy, including what has been referred to as the 'travel subsidy,' were known by many shareholders throughout the Native corporation." As the superior court's findings are not clearly erroneous, we uphold its conclusion that Kootznoowoo neither failed to provide necessary information to its shareholders, nor hid such information from them.

## C. There Was No Conflict of Interest among the Kootznoowoo Directors as to the Joint Venture Longshoring Program.

■ Finally, appellants claim that Kootznoowoo's participation in the longshoring and "travel subsidy" programs is improper, because this participation was never approved by a majority of disinterested directors or shareholders. Appellants claim that most of the directors who approved the programs were "interested" in that they used the longshoring employment opportunities and travel subsidies to benefit themselves and selected shareholders.

Kootznoowoo argues that it broadly distributed information about the longshoring and "travel subsidy" programs to all—not just selected—shareholders and furthermore that it had no control over who got called to take advantage of these programs. The corporation explains that Southeast Stevedoring determined the number of workers needed for joint venture projects and selected those qualified to be on the active skilled workers list. Kootznoowoo asserts that it merely maintained a rotation list of unskilled workers and notified those workers when their names came up on rotation. Kootznoowoo also notes that only one person—Frank Jack, Jr.,—ever served as both a Kootznoowoo director and a longshore worker at the same time, and that Mr. Jack was a skilled and experienced longshore worker before he ever became a director; he became a director well after the longshoring and "travel subsidy" programs were instituted.

The superior court again made findings of fact consistent with Kootznoowoo's position. With regard to the process of assigning longshoring work, the court agreed that Kootznoowoo had no control over who qualified for the skilled worker list or how many workers would be designated for a job; Southeast Stevedoring controlled this. Thus the court found no systemic way in which Kootznoowoo directors manipulated longshoring assignments to benefit themselves or other shareholders. The court reinforced this point by noting that Southeast Stevedoring selected individuals for the skilled worker list based on individual merit, not share ownership. While appellants alleged that many members of the Jack family especially benefitted from the programs, the court stated that "the evidence supports the finding that members of the Jack family attained their 'skilled' positions on the basis of individual merit," and that "[t]he frequency of their dispatch reflects their willingness to accept dispatch assignments."

Once again, these findings, based on the totality of the evidence, are not clearly erroneous. They support the superior court's conclusion that Kootznoowoo's longshoring and travel subsidy programs were not illegally adopted or maintained by the board based on director conflicts of interest.

## IV. CONCLUSION.

Based on the foregoing reasons, the judgment is AFFIRMED.

FABE, Chief Justice, concurring.

Although I continue to believe that plaintiffs' allegations should have proceeded as

derivative actions,[1] I agree with the court that Judge Weeks correctly decided this case on the merits.

---

1. *See Demmert v. Kootznoowoo*, 960 P.2d 606, 613 (Alaska 1998) (Fabe, J., dissenting); *Hanson v. Kake Tribal Corp.*, 939 P.2d 1320, 1334 (Alaska 1997) (Fabe, J., dissenting).